605 So.2d 856 (1992)
Robert B. POWER, Jr., Appellant/Cross-Appellee,
v.
STATE of Florida, Appellee/Cross-Appellant.
No. 77157.
Supreme Court of Florida.
August 27, 1992.
Rehearing Denied October 27, 1992.
*858 James B. Gibson, Public Defender and Christopher S. Quarles, Asst. Public Defender, Daytona Beach, for appellant/cross-appellee.
Robert A. Butterworth, Atty. Gen., and Barbara C. Davis, Asst. Atty. Gen., Daytona Beach, for appellee/cross-appellant.
PER CURIAM.
Robert B. Power, Jr., appeals his conviction for first-degree murder and imposition of the death penalty.[1] We affirm the conviction and the sentence.
The conviction arises from events occurring on October 6, 1987, when Frank Miller, a friend of the Bare family, arrived at the Bare home with his daughter to pick up twelve-year-old Angeli Bare for school. When he arrived, Miller honked the horn twice. He then glanced at the house where he saw a man standing inside the doorway with his back to the street. Miller assumed the man was Angeli's father because he was approximately the same build. The man made a gesture which Miller interpreted as meaning for him to wait. Miller remained in his car. When he next looked, he noticed the front door was closed with no one in sight. At approximately 8:55 a.m., Angeli came out of her house and walked down to the sidewalk to Miller's car. She approached within three feet of the passenger side of the car (the side closest to the house), and stopped. At that point, Miller noticed that Angeli appeared very nervous.
Angeli told Miller that there was a man in the house who she believed wanted to rob her. Angeli refused Miller's repeated requests to get into the car because, she said, the man in the house would kill all three of them. Miller told Angeli that he would get help and immediately drove the four blocks back to his own house and called the Bares at work and 911. Miller then drove back and parked four or five houses away from the Bares' home.
At approximately 9:10 a.m., Deputy Richard Welty received a radio dispatch and drove to the Bare home. En route, he was flagged down by Miller who related what he saw. Miller described the man he had seen as a white male with reddish hair. Mr. and Mrs. Bare, who had just arrived, stated that Angeli's biological father, who lived in California, had reddish hair.
Deputy Welty went to the Bare home and searched it but found nothing. After *859 another officer arrived, Welty went to check the field behind the Bare home. Welty walked west into an area filled with heavy brush and trees. He followed a path with his revolver drawn in one hand and his two-way radio in the other. When the footing became treacherous, Welty holstered his gun as a safety precaution, and proceeded down the path. Welty then noticed a white male with sandy blond hair walking casually through the field. The man, who was wearing worn blue jeans and a dungaree-style shirt, appeared to have a sandwich in his right hand and was "high-stepping" through the field toward a nearby construction site.
Because Welty was originally looking for a man with reddish hair, he called a fellow officer on the radio to ask for a better description from Frank Miller. While talking on the radio, Welty became unsure of his footing, looked down, and when he looked up again, found himself facing the man he had seen earlier now pointing a gun at him. Welty subsequently identified the man as Robert Power.
Power told Welty to hand over his sidearm. Welty thrust his hands into the air and then slowly reached for his pistol. Power then ordered Welty to put his hands into the air once again and retrieved Welty's pistol himself. Power asked Welty, "How many others are there?" Deputy Welty told Power that there were "six deputies on the scene." After a lengthy pause, Power asked for and received Welty's radio. Power then ordered the deputy to run in the direction of the construction site and warned him, "If you turn around, I will kill you." Welty jogged about thirty feet, stopped, looked back, and saw Power running west towards U.S. 441. Angeli Bare's body was found in the same general direction later that morning.
Welty ran back to the Bare home and reported that the culprit had his radio and service revolver. The police set up a perimeter but were unable to apprehend the fleeing suspect.
It was late morning or early afternoon before authorities found the body of Angeli Bare in the tall grass of the field behind her home. The body was lying on its right side, gagged and "hog-tied" by the wrists and ankles. The body was nude from the waist down. Lying nearby were her school books, jacket, purse, and an empty paper lunch bag. Officer Welty's service revolver was later found in a wooded area near the canal.
The autopsy revealed that the victim's left eye was blackened and that she had superficial contusions on her neck. In the medical examiner's opinion, the death of Angeli Bare resulted from shock following exsanguination due to the severance of the right carotid artery. The artery was cut by a stab wound on the right side of her neck. The autopsy also revealed injuries to the vaginal and anal area. The doctor estimated that these injuries were the result of the insertion of an oversized foreign object, perhaps a human penis. The doctor approximated the time of death as within thirty minutes of 9:15 a.m. The crime lab serologist found no semen on the victim's underwear. Vaginal, rectal, and oral swabs revealed no spermatozoa. Blood stains found on the victim's underwear were the same blood type as that of the victim.
Police conducted a thorough search of the Bare home. They found no signs of a struggle or forced entry. Angeli's bank had been pried open and a screwdriver was found in the kitchen sink. None of the latent prints found by the crime scene technicians matched Robert Power. Latent fingerprints found on Officer Welty's service revolver also did not match Robert Power. Police found no latent fingerprints of any kind on the victim's body. According to the State's experts, however, three pubic hairs from Angeli's bedspread were indistinguishable from Power's known pubic hairs, and one pubic hair from Angeli's fitted bed sheet was indistinguishable from Power's. Additionally, a single hair recovered during the autopsy from Angeli's pubic area was indistinguishable from Power's pubic hair.
The State's experts agreed that a number of head hairs of unknown origin found in the sheets of Angeli's bedding did not *860 match Power's. Numerous hairs recovered from the bedding and clothing remained unidentified at the time of trial.
Approximately ten days after the murder, Officer Welty identified a photograph of Robert Power as the man who robbed him in the field. A SWAT team executed a search warrant at the residence of Robert Power, who lived at the house with his mother, her youngest daughter, her eldest son, that son's wife, and their three children. Robert Power was found hiding in the attic and was arrested. Police seized a maroon duffle bag from the attic that was close to Power. The duffle bag contained a pistol, some ammunition, a pair of tan driving gloves, a red bandanna, at least three documents with Robert Power's name on them, and a folding knife.
Police also found a box in the front bedroom containing various electronic parts, one of which contained a serial number corresponding to the serial number of the radio that was taken from Deputy Welty. An exhaustive examination of the box revealed numerous latent fingerprints, none of which matched Robert Power's. The crime lab was unable to find any useful latent prints on the radio parts inside the box. Police seized some green, hooded sweatshirts and several denim work shirts from the front bedroom. According to the State's experts, two of three head hairs recovered from the sweatshirts were consistent with Angeli Bare's.
The jury found Power guilty of first-degree murder, sexual battery, kidnapping of a child under the age of thirteen, armed burglary of a dwelling, and armed robbery. The jury recommended death for the homicide. The trial court concurred, finding no mitigating circumstances and four aggravating factors. The court considered and rejected as mitigation the defendant's age of twenty-five years at the time of the crime and the defendant's lack of future dangerousness because he was already serving a prison term of ten consecutive life sentences. The court expressly refused to consider the comparative cost of the death penalty versus life sentences as a mitigating circumstance. The court found in aggravation that (1) the defendant was previously convicted of a felony involving the use or threat of violence;[2] (2) the homicide was committed while the defendant was engaged in the commission of the crimes of sexual battery, burglary, and kidnapping;[3] (3) the homicide was especially heinous, atrocious, or cruel;[4] and (4) the homicide was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.[5] The court sentenced Power to consecutive life terms for the noncapital felonies.
Power raises numerous issues on appeal that he argues require reversal of his conviction for first-degree murder and the capital sentence.[6] Power first claims that the evidence in this case was insufficient to sustain the jury verdict. After a thorough review of the record, we are satisfied that the evidence was sufficient to support the conviction. The State offered, among other evidence, that a white male with reddish hair (Power's was sandy blond) was in the Bare house with a gun at approximately 8:55 a.m. The medical examiner testified that death occurred around 9:15 a.m. The man threatened to kill Angeli Bare. Power robbed Deputy Welty at gunpoint at approximately 9:25 a.m. at a location approximately 75 paces from the body. Hair indistinguishable from Power's was found on the bedding in the victim's room and on the victim's pubic area. Head hairs recovered from a sweatshirt found in the house where Power was arrested were consistent with the victim's. When Power was arrested, he was found hiding in the attic crouched near a maroon bag containing a gun, a knife, and gloves. The facts in this case were sufficient under the appropriate standard for a jury to consider *861 whether Robert Power murdered Angeli Bare.[7]
We reject Power's next contention that the prosecutor improperly commented on Power's failure to testify in violation of his constitutional right against self-incrimination. The error, if any, under the circumstances of this case, was harmless.
Power next argues that the trial court erred in allowing the introduction of hearsay evidence that erroneously indicated that Power stole Deputy Welty's radio. Without going into detail, we conclude that the error, if any, was harmless. Any issue regarding Deputy Welty's radio is muted because Deputy Welty clearly identified Power as the man who robbed him in the field behind the Bare residence. Thus, with reference to Power's proximity to scene of the murder, there is no added probative value to linking the radio part found in Power's residence to Deputy Welty. The evidence is irrelevant to any other material issue.
Power's third point on appeal is that the trial court erred in instructing the jury on flight and in denying Power's request for a limiting instruction. The State maintained that the flight instruction was warranted because the evidence indicated that Power ran away after he robbed Welty in the field behind the Bare home. Defense counsel pointed out that when Welty first spotted Power, Power was walking casually. Thus, defense counsel asked the court to narrow the flight instruction by informing the jury that the instruction applied only to the robbery of Welty because there was insufficient evidence of flight from the murder, burglary, sexual battery, and kidnapping.
This Court recently abolished the flight instruction in Fenelon v. State, 594 So.2d 292 (Fla. 1992). However, we agree with the State, as we did in Fenelon, that giving the flight instruction, even if error, was harmless beyond a reasonable doubt in this case. The murder occurred within ten or fifteen minutes of the time Power robbed Deputy Welty. Thus, the question of whether Power was fleeing the robbery, or the robbery and the murder, is clearly a close call. Although it would have been better for the judge not to have given any instruction on flight, Power has failed to show that the trial court abused its discretion in refusing to give a limiting instruction. In any case, the circumstantial evidence instruction, along with the testimony adduced at trial that Power was "casually" walking through the field prior to his encounter with Deputy Welty, diminished any negative effect from the flight instruction.
Fourth, Power argues that he was denied the right to a fair trial when a deputy sheriff prepared to "draw down" on him in full view of the jury. The record reveals that in order to impeach Deputy Welty's description of the man who robbed him, defense counsel requested Power to stand up at counsel table and open his shirt to display his chest hair to the jury. Despite defense counsel's previous warning to the head bailiff, a deputy jumped up from his seat approximately twenty feet away, walked directly in front of Power, and placed his hand on the butt of his gun. Defense counsel immediately moved for a mistrial. The trial court took the motion under advisement, and, after a hearing held at the close of the evidence, denied the motion for mistrial.
Ruling on a motion for a mistrial is within the sound discretion of the trial court. Salvatore v. State, 366 So.2d 745, 759 (Fla. 1978), cert. denied, 444 U.S. 885, 100 S.Ct. 177, 62 L.Ed.2d 115 (1979). A motion for mistrial should be granted only when it is necessary to ensure that the defendant receives a fair trial. E.g., Marek v. State, 492 So.2d 1055, 1057 (Fla. 1986). In the present case, the record is clear that the trial court made every effort to discern whether Power suffered any prejudice. In fact, the trial judge carefully observed a reenactment of the episode from various vantage *862 points in the jury box and only then concluded that there was no prejudice.
The Court has looked at the jury's view of this. The Court recalls the incident, having been sitting at the bench. I don't recall the defendant or the deputy having his hands on his weapon, but I do remember hearing the movement, and see[ing] him move up beside Robert. From the jury's viewpoint, the quick movement, and the fact that he had moved on [to] a position very near to Robert, does not appear to the Court to be necessarily threatening. It would be clear that he probably was resting his hand on his gun, but it was not nearly as threatening from the jury's viewpoint as it would have been from the defendant's viewpoint and the defense attorney's viewpoint. Having been in the viewpoint, as I walked by there, I could see where that would be more of a threatening gesture to you than it would be to the jury. All in all, I don't think it has prejudiced the jury and does not rise to the point of a justification for mistrial in this case. So I'll deny the motion for mistrial.
In light of these findings, Power has failed to show that the trial court abused its discretion in refusing to grant a mistrial.
Power next argues that the trial court erred in allowing Deputy Welty to testify about the following hearsay statements made to him by Frank Miller:
1. Mr. Miller and his daughter customarily called for Angeli for school around 9:00 a.m.
2. The suspect was a white male with reddish-colored hair.
We agree with the State that these statements were probably admissible under the "excited utterance" exception to the hearsay rule. See § 90.803(2), Fla. Stat. (1989). Deputy Welty testified that when Mr. Miller flagged him down, "[h]e appeared to be a person that had just witnessed an unusual or serious crime, and very shaken." Additionally, the statement regarding the reddish hair was admissible nonhearsay as one of identification of a person made after perceiving him. See § 90.801(2)(c). Frank Miller testified at trial and was clearly subject to cross-examination concerning the statement. Even if the statements were erroneously admitted, any error was harmless. Miller had already testified that he customarily picked Angeli up for school and Welty testified that the man who robbed him had sandy blond hair, not reddish hair.
Next, Power argues that the trial court erred in refusing to suppress certain physical evidence because (1) the affidavit upon which the search warrant was based contained misleading information or omitted material facts; (2) the officers conducting the search did not "knock and announce" their identities and purpose in violation of section 933.09, Florida Statutes (1989); and (3) the search warrant was invalid because it contained the wrong name of the owner of the house. Addressing each in turn, Power first claims the affidavit was insufficient because it failed to state that (1) a previous rape victim who had identified Power as her assailant had also identified two other people as the culprit and (2) the identifying photograph of Power was eight years old and, according to Power, was selected to conform to Officer Welty's initial description of Power. We agree with the State, however, that even if the omitted information had been included, the affidavit would still have contained sufficient information to constitute probable cause. See Sotolongo v. State, 530 So.2d 514, 516 (Fla. 2d DCA 1988). As to the photograph, Power has not alleged that the identification procedure was unnecessarily suggestive or that there was a substantial likelihood of misidentification. See Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Consequently, the trial court did not abuse its discretion in denying the motion to suppress.
As to the alleged "knock and announce" violation, we observe that the officers serving the warrant had been informed that Power had used a gun or knife to rape several females, had committed armed robbery of a deputy, was a black belt in karate, and had a gun. Officer Barnes testified that, in his opinion, if the *863 officers knocked and announced, Power would have armed himself or hindered the arrest. Lieutenant Taylor testified that through interviews of family members they knew Power had a violent background. Accordingly, we find the trial court did not abuse its discretion in concluding from this evidence that the peril faced by the police would have been increased had they first demanded entrance and stated their purpose. See Benefield v. State, 160 So.2d 706, 710 (Fla. 1964); State v. Avendano, 540 So.2d 920, 921 (Fla. 2d DCA 1989).
Finally, we reject Power's claim that the search warrant was invalid because it incorrectly named the owner of the house as "Donald McNeal." The evidence shows that Power's mother, Donna McNeal, rented the residence. This type of scrivener's error does not render a search warrant invalid. See, e.g., State v. Oldack, 283 So.2d 73, 76 (Fla. 2d DCA 1973); see also Carr v. State, 529 So.2d 805, 806 (Fla. 1st DCA 1988) ("An inaccuracy in the warrant, such as an incorrect address or apartment number, does not invalidate the warrant if the place to be searched is otherwise sufficiently identified in the warrant."). Here, the place to be searched was sufficiently identified on the face of the warrant. There is no requirement that the warrant identify the owner or renter of the residence by name. See Samuel v. State, 222 So.2d 3, 5 (Fla. 1969); § 933.05, Fla. Stat. (1989).
We reject Power's claims that the trial court erred in allowing the introduction of allegedly irrelevant physical evidence  including the knife,[8] gun, and gloves found in the maroon bag that was close to Power when he was arrested  and an allegedly gruesome photograph of the victim. A review of the entire record reveals that the trial court did not abuse its discretion in admitting this evidence. See Welty v. State, 402 So.2d 1159, 1163 (Fla. 1981).
We reject without discussion Power's remaining guilt-phase claims that (1) the grand jury and its foreperson were selected discriminatorily and that the grand jury was illegally constituted and improperly paneled; (2) numerous errors during jury selection warrant a new trial;[9] (3) the trial court erred in not allowing the defense to impeach Deputy Welty regarding information that he omitted from his supplemental report; and (4) the trial court abused its discretion in refusing to give two special jury instructions.
Turning to the penalty phase, Power first claims that the trial court erred in restricting defense counsel's attempts to rehabilitate Dr. Radelet after the State impeached him regarding his personal bias against the death penalty. The primary relevance of Dr. Radelet's testimony related to Power's lack of future dangerousness because he was already serving ten consecutive life sentences for other crimes he had committed. The State's impeachment regarding the witness's personal bias against the death penalty cannot be seen as damaging to his testimony regarding future dangerousness. The marginal relevance of Dr. Radelet's testimony to issues other than Power's future dangerousness makes any error in this instance harmless.
Power's second claim is that the trial court improperly found that the killing was especially heinous, atrocious, and cruel. The trial court found:
The defendant, at age 25, over 6 foot tall, weighing in excess of 140 pounds and armed with a gun, took a small 12 year old girl prisoner. Terrorized her to the extent she was afraid to attempt to escape when a viable opportunity was presented. Removed her pants and sexually *864 assaulted her anally and vaginally. Hog tied and double gagged her and then, when she was entirely helpless, administered a fatal stab wound that caused her to slowly bleed to death over a period of 10 to 20 minutes. Some, if not all, of these acts had to have occurred while she was conscious.
We find no abuse of discretion with respect to the finding of this aggravating factor.
Power also contends that the trial court erred in finding that the murder was committed in a cold, calculated, and premeditated manner. The trial court found:
It is clear from the evidence in this case and the testimony of the victims of the defendant's prior sexual assaults that the defendant had thought out, designed, prepared or adapted by forethought his method of attacking females... .
... .
In this case he followed his previously designed method or plan of attack. He subdued Angeli Bare with the threat of violence and the use of a gun... . While she was helpless, without any pretense of moral or legal justification, he stabbed her in the neck, causing her to bleed to death in the manner he had previously thought out and described to his victim of September 23, 1987... .
The coldness with which this was accomplished was demonstrated by the defendant eating the victim's sandwich she had prepared for lunch as he walked away from the scene of this brutal murder and his lack of emotion or nervousness when confronting Deputy Welty.
To establish the heightened premeditation required for a finding that the murder was committed in a cold, calculated, and premeditated manner, the evidence must show that the defendant had a "careful plan or prearranged design to kill." Rogers v. State, 511 So.2d 526, 533 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). None of the facts recited above establish that Power had a prearranged plan to kill Angeli Bare. Rather, the evidence establishes, at best, a plan to rape. Furthermore, even if it were permissible for a judge to rely on the circumstances of previous crimes to support the finding of an aggravating factor, such evidence, standing alone, can never establish, beyond a reasonable doubt, that the murder at issue was so aggravated. In any case, it is significant that none of the previous crimes committed by Power resulted in the death of the victim. It is thus impossible to infer that Power had a premeditated design to kill the victim in this case. Lastly, the eating of the victim's sandwich, an event that occurred after the commission of the murder, cannot sustain the necessary finding of heightened premeditation before the murder. Consequently, we hold that the trial court erred in finding this aggravating circumstance.
Having determined that one of the four aggravating factors in this case was improperly found, we must examine the effect of this error on the outcome of the sentencing. Based on the evidence in this record, including the nature of the three other aggravating circumstances, and the lack of statutory or nonstatutory mitigating circumstances, we conclude that the trial court would have imposed the same sentence without the other aggravator and therefore find the error to be harmless beyond a reasonable doubt.
Lastly, we reject as meritless Power's claims that (1) he was denied effective assistance of counsel and a full appellate review due to inaccuracies in the trial transcript; (2) section 921.141(5)(h), Florida Statutes (1989), which defines the statutory aggravating circumstance of heinous, atrocious, and cruel, and the standard jury instruction on this factor, are unconstitutionally vague;[10] and (3) Florida's capital sentencing statute is unconstitutional.
*865 Accordingly, we affirm Power's conviction for first-degree murder and sentence of death.
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, SHAW, GRIMES, KOGAN and HARDING, JJ., concur.
NOTES
[1] We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution.
[2] § 921.141(5)(b), Fla. Stat. (1989).
[3] Id. § 921.141(5)(d).
[4] Id. § 921.141(5)(h).
[5] Id. § 921.141(5)(i).
[6] Because we affirm the conviction and sentence, we do not address the issues raised by the State on cross-appeal.
[7] At trial, the State unsuccessfully attempted to introduce evidence that Power was convicted of committing five other sexual batteries the month before the present killing. See Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959). Because we uphold the conviction, we need not address this issue here.
[8] Power also claims that the trial court erroneously commented on the evidence by giving the jury a special instruction regarding whether there was blood on the knife. However, because defense counsel agreed to the instruction, the issue is waived. Castor v. State, 365 So.2d 701, 703 (Fla. 1978).
[9] Power claims (1) he would have been entitled to 50 peremptory challenges if each offense had been tried separately but that he received only ten; (2) that the trial court refused to sequester the jury despite evidence of extensive publicity; and (3) the trial court erred in overruling Power's objection regarding the absence of African-Americans and death-sentence-opposed jurors on the venire.
[10] The trial court in this case instructed the jury on this aggravating circumstance using the limiting construction adopted by this Court in State v. Dixon, 283 So.2d 1, 9 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974), and approved by the United State Supreme Court in Proffitt v. Florida, 428 U.S. 242, 255-56, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913 (1976). Consequently, the jury instruction given in this case is not unconstitutionally vague. See Espinosa v. Florida, ___ U.S. ___, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992); Sochor v. Florida, ___ U.S. ___, ___, 112 S.Ct. 2114, 2126, 119 L.Ed.2d 326 (1992) (Stevens, J., dissenting).