837 So.2d 381 (2002)
Connie Ray ISRAEL, Appellant,
v.
STATE of Florida, Appellee.
No. SC95873.
Supreme Court of Florida.
December 19, 2002.
*383 James B. Gibson, Public Defender, James R. Wulchak, Chief, Appellate Division, Assistant Public Defender, and George D.E. Burden, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, Florida, for Appellant.
Richard E. Doran, Attorney General, and Kenneth S. Nunnelley, Assistant Attorney General, Daytona Beach, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court finding Connie Ray Israel guilty of first-degree murder and imposing a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm Israel's judgment and sentence.

FACTUAL AND PROCEDURAL BACKGROUND
Connie Ray Israel was charged with burglary of a dwelling with a battery, kidnaping, *384 sexual battery with great force, and first-degree murder arising out of the December 27, 1991, murder of Esther Hagans in her home in Putnam County. At Israel's first trial, the jury was unable to reach a verdict and a mistrial was declared. On February 2, 1999, Israel's second trial began and the evidence revealed the following facts. Neighbors and friends indicated that Esther Hagans was known to carry large amounts of money on occasion. They indicated she rarely missed work unless she was very ill. On the morning of December 27, 1991, when she did not report for work, a fellow employee went to Hagans' neighbor's house to ask about her. The neighbor noticed that Hagans' car was in the carport and called her house. When Hagans did not respond to the telephone call, the neighbor called the police.
The police found Hagans' front door ajar and discovered her body in the bedroom. Hagans was lying naked on the bed with her legs spread apart and her hands tied behind her back. The medical examiner identified trauma to the left side of Hagans' head, determined that her right eye was full of blood, and described cuts to the left eyebrow and temple, as well as abrasions on the right side of her face. The medical examiner also identified a tear on the right side of Hagans' head that resulted from blunt trauma, which caused major hemorrhage to the brain. The medical examiner stated there were external vaginal injuries consistent with sexual assault. As to the cause of death, the medical examiner explained that Hagans had a weak heart which gave out due to the stress and shock of the beating and sexual assault she had endured.
At the crime scene, the police found footprints on the front porch steps and in a drainage ditch that ran along the front of the house. A screwdriver was found outside a window. Based on these factors it was determined that the point of entry was a window leading into Hagans' bedroom. Sperm and semen stains were discovered on a pillowcase in the Hagans' bedroom. Semen was also found on a slip and a bedspread recovered from the bedroom. The semen on both the slip and the bedspread was consistent with the semen recovered from the pillowcase. Likewise, semen found on vaginal swabs taken from the victim was consistent with the semen from the other items in the bedroom. Human blood was also found on a towel at the scene.
The evidence showed that Israel registered at the Palatka Holiday Inn on December 28, 1991, and paid for two nights in cash. Maryann Pittman testified that she was a prostitute working in Palatka and knew Israel.[1] Pittman stated that in December of 1991 she went with Israel to the Holiday Inn where they used crack cocaine. Pittman took a shower in the hotel room. She indicated that she saw a pair of pants and a shirt in the bathtub and that the water in the bathtub was red. Pittman also saw a black purse under the bed in the hotel room. She testified that Israel had money in his wallet when she looked through it. Israel told her he received the money from the Florida Lottery.
Israel's friend, Melvin Shorter, testified that he saw Israel and Pittman at the Holiday Inn where they were using crack cocaine. Shorter testified that he sold crack cocaine to Israel three or four times that day. Israel paid cash for the crack cocaine with money he retrieved from a *385 wallet under the bed in the hotel room. Israel told Shorter he had "hit the lottery."
Israel also registered at the William Penn Motel on December 30, 1991, and paid for one week in cash. Israel stayed only one night and was given a cash refund, for which he signed a receipt.
Israel and three other individuals were developed as suspects in Hagans' murder. Eventually, the Florida Department of Law Enforcement was solicited to help with the investigation and after more interviews a blood sample was taken from Israel. After DNA testing comparing Israel's blood sample to the semen stains found on the pillowcase and the slip, Israel was identified as the source of the semen stains in Hagans' bedroom and was arrested in 1993.
Arthur McComb, a prisoner who was a legal clerk and who was housed in the same cell with Israel, testified that Israel asked for help with his case. During their discussions, Israel stated he was charged with first-degree murder and that he tried to knock the victim's head off because she tried to "gum him." Additionally Israel indicated that he sexually assaulted the victim and had gone to the victim's house to steal church money and had taken $7,000 to $10,000.
Israel testified in his own defense, stating he was told by law enforcement officers that when the first officers arrived on the scene and found Hagans dead, they made it appear Hagans was beaten to death in order to keep $5,000 discovered in a dresser drawer. Israel testified he had nothing to do with breaking into Hagans' house. Israel also insisted his semen was not found at the crime scene and that his blood was planted on objects found at the crime scene. He stated that he had only allowed McComb to read the accusations against him but had never confessed.
On March 1, 1999, the jury found Israel guilty as charged. After penalty proceedings, the jury returned a recommendation of death by a vote of eleven to one. Following the Spencer[2] hearing on May 14, 1999, the trial court sentenced Israel to death on May 28, 1999, finding four aggravating circumstances[3] and two statutory mitigating circumstances.[4]
Israel raises seven issues on appeal, claiming the trial court erred in (1) conducting portions of the trial when Israel was involuntarily excluded; (2) denying Israel's motion for continuance of trial; (3) denying Israel's motion for mistrial; (4) requiring Israel to be held in visible restraints before the jury; (5) ignoring nonstatutory mitigating evidence of drug abuse, brain damage, and low intellectual functioning presented during the penalty phase; (6) allowing the jury's death sentence to stand even though it was grounded on a split jury vote; and (7) ruling Israel's death sentence was proportionate.

*386 GUILT PHASE

Israel claims the trial court erred in conducting portions of the jury selection while he was involuntarily absent from the courtroom. Israel's trial began on Monday, February 22, 1999, with jury qualification. During this proceeding defense counsel moved for a continuance, contending Israel was experiencing vision problems and dizziness.[5] The trial court denied the motion after discussing the issue with Israel, defense counsel, and a jail nurse, who appeared by telephone from the jail facility. The jurors were given a fifteen-minute break and at some point in this process, Israel absented himself from the courtroom. After the trial court discussed Israel's medical situation with the nurse from the jail, Israel was brought into the courtroom and was questioned about whether he wished to remain in the courtroom. Following this exchange, the jurors were brought back into the courtroom for individual voir dire, but just as the trial court questioned the first prospective juror, Israel stated he was sick and asked to be taken back to his holding cell until he received medication.
The trial court again questioned Israel about his decision to leave the courtroom. This time the proceedings were conducted at Israel's holding cell because he refused to return to the courtroom. The trial judge recommended to Israel that he sit in the courtroom and assured Israel that if he changed his mind he would be welcomed back immediately.
When the trial resumed after lunch, the trial court asked defense counsel if Israel had changed his mind about coming to the courtroom. However, before anyone could answer, the clerk reported that an ambulance had been called because Israel had initiated a physical altercation with a bailiff in his holding cell. Israel was brought into the courtroom and in response to the trial court's question, stated that he did not wish to remain. Israel remained in his holding cell for the duration of proceedings conducted on Monday, February 22.
Trial continued on Tuesday, February 23, and proceedings were again held at Israel's holding cell to determine whether Israel wished to come into the courtroom. Israel stated only that he felt sick and would not respond further to the trial court's inquiry. After lunch, the trial court asked defense counsel whether Israel wished to join the trial, but defense counsel answered that Israel did not. The trial court repeated to defense counsel that Israel was welcome back at any time. The trial court also asked the bailiff whether Israel had requested anything and the bailiff responded that Israel had not. By the end of trial on Tuesday, nine prospective jurors had been chosen.
We begin our discussion of this issue by noting that "[c]riminal defendants have a due process right to be physically present in all critical stages of trial, including the examination of prospective jurors." Muhammad v. State, 782 So.2d 343, 351 (Fla.2001) (relying on Snyder v. Massachusetts, 291 U.S. 97, 106, 54 S.Ct. 330, 78 L.Ed. 674 (1934), overruled in part on other grounds by Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)). Florida Rule of Criminal Procedure 3.180(a) recognizes this right, providing that in all criminal prosecutions the defendant shall be present "at the beginning of the trial during the examination, challenging, impanelling, and swearing of the jury." Fla. R.Crim. P. 3.180(a)(4).
*387 However, when a defendant voluntarily absents himself from the courtroom, rule 3.180(c) provides:
Defendant Absenting Self. If the defendant is present at the beginning of trial and thereafter, during the progress of the trial or before the verdict of the jury has been returned into court, voluntarily absents himself or herself from the presence of the court without leave of court, or is removed from the presence of the court because of his or her disruptive conduct during the trial, the trial of the cause or the return of the verdict of the jury in the case shall not thereby be postponed or delayed, but the trial, the submission of the case to the jury for verdict, and the return of the verdict thereon shall proceed in all respects as though the defendant were present in court at all times.
A defendant can waive his right to be present by voluntarily absenting himself from the courtroom.
Israel, however, attempts to classify his absence from the courtroom as involuntary and argues he was wrongfully excluded from jury selection. The record does not support his claim; instead, the record shows that Israel voluntarily chose to remain outside the courtroom in his holding cell for most of Monday and all of Tuesday as trial proceedings continued. After Israel asked to be taken to his holding cell on Monday, the trial court questioned him on the record about his decision, recommending to Israel that he remain in the courtroom and assuring him that he would be welcome back at any time. Likewise on Tuesday, the trial court questioned Israel to determine whether he wished to come into the courtroom but Israel refused to answer. The trial court made a conscientious effort to ensure that Israel was aware of his right to be present, and made it very clear to both defense counsel and Israel that Israel could rejoin the proceedings at any time. We find that because Israel's absence from the courtroom was voluntary, he waived his right to be present during jury selection on Tuesday. The trial court did not err in conducting jury selection while Israel chose to remain in his holding cell.[6]
As his second guilt phase issue, Israel claims the trial court erred in denying his motion for continuance of trial. Israel moved for a continuance at the start of trial, claiming he was too ill to proceed. Israel indicated to defense counsel that he (Israel) had not received the proper medications from the Department of Corrections after transport to the jail to await trial. The trial judge spoke with the nurse from the jail, who indicated that Israel's prescription from the correctional facility had expired and that Israel had been given a nonprescription strength pain reliever that day for his headache. The trial court then questioned defense counsel about Israel's medical history and indicated it was familiar with Israel's health-related complaints.
*388 As we explained in Kearse v. State, 770 So.2d 1119 (Fla.2000):
The granting of a continuance is within the trial court's discretion, and the court's ruling on a motion for continuance will only be reversed when an abuse of discretion is shown. See Gorby v. State, 630 So.2d 544, 546 (Fla.1993). An abuse of discretion is generally not found unless the court's ruling on the continuance results in undue prejudice to defendant. See Fennie v. State, 648 So.2d 95, 97 (Fla.1994). This general rule is true even in death penalty cases. "While death penalty cases command [this Court's] closest scrutiny, it is still the obligation of an appellate court to review with caution the exercise of experienced discretion by a trial judge in matters such as a motion for a continuance." Cooper v. State, 336 So.2d 1133, 1138 (Fla.1976); see also Hunter v. State, 660 So.2d 244, 249 (Fla.1995).
Id. at 1127. A trial judge's ruling on a motion for a continuance will only be disturbed if there has been an abuse of that discretion.
We find the trial court did not abuse its discretion in denying Israel's motion for a continuance. The trial court allowed Israel ample opportunity to explain his reasons for requesting a continuance, listening to Israel at length about his illness and his request for medication. The trial court also spoke with the nurse from the county jail who was familiar with Israel and his medical condition. Finally, and we believe most importantly, as the proceedings were about to recommence after lunch, Israel initiated a physical altercation with a bailiff resulting in injuries.[7] This altercation tends to negate Israel's claim that he was too ill to proceed with trial. Because the trial court's informed ruling did not result in undue prejudice to Israel, we find the trial court did not abuse its discretion, and we deny relief on this claim.
Israel next argues the trial court erred in failing to grant his motion for mistrial based on a prejudicial statement made during the direct examination of a state witness. We disagree. A ruling on a motion for mistrial is within the sound discretion of the trial court. See Power v. State, 605 So.2d 856, 861 (Fla.1992). A motion for mistrial should be granted only when it is necessary to ensure that the defendant receives a fair trial. See Terry v. State, 668 So.2d 954 (Fla.1996). The statement by the witness in this case did not deprive Israel of a fair trial.
During the State's case-in-chief, the prosecutor elicited testimony from Arthur McComb, Israel's cellmate for several days at New River Correctional Institute in 1994. Evidently Israel had learned that McComb had experience with legal procedures and asked McComb for help with his case. McComb testified that during the conversation Israel began telling him about his case, a first-degree murder case. McComb said that Israel talked about more than one, and he, McComb, could talk in detail about two cases. Defense counsel immediately objected and moved for a mistrial on the ground that McComb revealed Israel had been charged with an additional murder. The State replied that the defense had not filed a motion in limine to keep McComb's testimony out of the trial. The trial court denied the motion for mistrial and refused the defense's request to admonish the jury not to consider McComb's statement, stating it did not want to bring additional attention to this particular matter.
*389 Israel claims, relying on Hardie v. State, 513 So.2d 791 (Fla. 4th DCA 1987), that McComb's testimony resulted in an unfair trial because McComb revealed to the jury that Israel had more than one murder charge. In Hardie, the defendant and two other men were charged with grand theft for a "smash and grab" at a jewelry department store. The theft took place during store hours and was videotaped. Over defense objection, five police officers expressed their opinions as to the identity of the persons depicted in the videotape. The Fourth District found the defendant suffered prejudice as a result of several witnesses being identified as police officers and then testifying concerning his identity because it created the impression that the defendant had been involved in other criminal activities or had a prior record. Id. at 792. Israel argues the same conclusion must be reached in this case because the jury undoubtedly concluded Israel had committed multiple murders based on McComb's statement. We find, however, that McComb's lone statement is simply not comparable to the situation in Hardie, where five witnesses identified themselves as police officers and implied that the defendant had been involved in other criminal activities or had a prior record.
Instead, we find this issue more akin to Evans v. State, 800 So.2d 182 (Fla.2001). In Evans, the defendant claimed he was deprived of a fair trial when a State witness referred to "records of the Orlando Police Department" because the jury could conclude from that statement that the defendant had a prior criminal record. Id. at 189. We disagreed, in part because the reference was isolated and not focused upon. Id. We reach the same conclusion in this case. McComb's statement was neither highlighted for the jury by the prosecutor nor focused upon by the trial court. The trial court refused to admonish the jury so that no further attention would be drawn to the statement. See Cole v. State, 701 So.2d 845 (Fla.1997); Merck v. State, 664 So.2d 939 (Fla.1995). The trial court was well within its discretion to determine that the statement did not prevent Israel from receiving a fair trial. See Power, 605 So.2d at 861; Merck, 664 So.2d at 941.
Israel also claims, citing Castro v. State, 547 So.2d 111 (Fla.1989), that the trial court's refusal to grant a mistrial was error with respect to the penalty phase. In Castro, we found the trial court erred in admitting improper Williams[8] rule testimony and that this error was harmless as to the guilt phase. Id. at 115. As to the penalty phase, however, we found the Williams rule error improperly tended to negate the case for mitigation presented by the defendant and thus may have influenced the jury in its penalty-phase deliberation. Id. at 116. In this case, however, there is no evidence supporting the contention that McComb's statement tended to negate the case for mitigation presented by Israel. Israel's mitigation evidence consisted of testimony from a clinical psychologist about Israel's mental state. There was no attempt by the defense to negate Israel's criminal history. In fact, the State presented evidence of Israel's prior criminal history via judgments and sentences and live witnesses. We deny relief on this issue because Israel has failed to demonstrate how this lone reference during the trial of information that was explored at the penalty phase negated his mitigation.
As his final guilt phase claim, Israel argues the trial court erred in requiring him to be held in restraints before the *390 jury. As a general rule, a defendant in a criminal trial has the right to appear before the jury free from physical restraints, such as shackles or leg and waist restraints. See Illinois v. Allen, 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). We have recognized that restraining a defendant with shackles in view of the jury adversely impacts an accused's presumption of innocence. See Diaz v. State, 513 So.2d 1045, 1047 (Fla.1987); Elledge v. State, 408 So.2d 1021, 1022 (Fla. 1981).
However, a criminal defendant's right to be free of physical restraints is not absolute because "under some circumstances, shackling `is necessary for the safe, reasonable and orderly progress of trial.'" United States v. Mayes, 158 F.3d 1215, 1225 (11th Cir.1998) (quoting United States v. Theriault, 531 F.2d 281, 284 (5th Cir.1976)). "Courtroom security is a competing interest that may, at times, `outweigh[ ] a defendant's right to stand before the jury untainted by physical reminders of his status as an accused.'" Mayes, 158 F.3d at 1225 (quoting Allen v. Montgomery, 728 F.2d 1409, 1413 (11th Cir.1984)). Indeed, we have held that shackling is a permissible tool to be exercised in the sound discretion of the trial judge when circumstances involving the security and safety of the proceeding warrant it. See Derrick v. State, 581 So.2d 31, 35 (Fla.1991); Correll v. Dugger, 558 So.2d 422 (Fla.1990); Stewart v. State, 549 So.2d 171 (Fla.1989). "Shackles may be necessary to prevent the defendant from disrupting the trial ... and to protect the physical well-being of the jury, lawyers, judge, and other trial participants." Zygadlo v. Wainwright, 720 F.2d 1221, 1223 (11th Cir.1983). In this case, the shackles were necessary to prevent the defendant from disrupting the proceedings.
Israel first disrupted the proceedings by leaving the courtroom during jury selection on Monday, February 22. Later the same day, a bailiff was injured when Israel initiated a physical altercation with him in his holding cell. On Tuesday, February 23, Israel remained in his holding cell while his trial continued in the courtroom. On Wednesday, February 24, Israel indicated he wished to return to the courtroom, and the trial court stated to defense counsel that in light of the altercation the court was going to require that Israel wear security restraints and remain seated while in the courtroom. The bailiff indicated that Israel's hands would be placed in front of his waist chain, and that if Israel remained seated, it would not be obvious that he was wearing restraints.
We find the trial court did not abuse its discretion in requiring Israel to wear restraints. By interrupting the proceedings and failing to follow the trial court's directions, Israel demonstrated a complete lack of respect for the trial court. Moreover, Israel initiated a physical attack resulting in injuries to a bailiff. The trial court indicated it had observed Israel's "recent demonstrations of anger and bizarre misconduct," and expressed its concern for the safety of court personnel and counsel "in light of what we've gone through here over the history of the case." Moreover, the trial court took steps to ensure the least amount of prejudice by securing Israel's hands in front of his body and by allowing him to remain seated so that the jury's view of the restraints was obstructed. Because the security and safety of the proceeding warranted restraints, we find the trial court did not abuse its discretion in requiring restraints. See Derrick, 581 So.2d at 35.

PENALTY PHASE
Israel raises three issues related to the penalty phase proceedings. First, *391 he argues the trial court erred in ignoring nonstatutory mitigating evidence of drug abuse, brain damage, and low intellectual functioning presented during the penalty phase. This evidence was presented during the testimony of Israel's one witness, a clinical psychologist, Dr. Harry Krop. Dr. Krop testified that he saw Israel seven times and that Israel was generally uncooperative. Dr. Krop administered five neuropsychological tests to determine whether Israel suffered some type of brain damage, but for the most part Israel was unwilling to cooperate. Dr. Krop testified that Israel's IQ testing placed him at the low-average range of intellectual ability, and that his testing was suggestive of a person who probably had organic or neurological impairment all his life. However, Dr. Krop testified that because he did not have Israel's records, he could not determine the cause of Israel's brain damage. Overall, Dr. Krop stated he would diagnose Israel as an individual with a history of substance abuse, and personality disorder with antisocial, paranoid, and hypochondriacal features.
In Chandler v. State, 702 So.2d 186 (Fla. 1997), we reiterated the approved procedure by which the trial court must address mitigating evidence:
The sentencing judge must expressly evaluate in his or her sentencing order each statutory and non-statutory mitigating circumstance proposed by the defendant. This evaluation must determine if the statutory mitigating circumstance is supported by the evidence and if the non-statutory mitigating circumstance is truly of a mitigating nature. A mitigator is supported by evidence if it is mitigating in nature and reasonably established by the greater weight of the evidence.
Id. at 200 (quoting Ferrell v. State, 653 So.2d 367, 371 (Fla.1995)). See also Knight v. State, 746 So.2d 423, 435 (Fla. 1998); Spencer v. State, 645 So.2d 377, 385 (Fla.1994).
In this case, the defense requested the two statutory mental mitigating circumstances. The trial court addressed both statutory mitigators in its sentencing order and found them to be supported by the testimony of Dr. Krop. The defense also requested the catch-all mitigating circumstance, which the trial court addressed as follows:
Other evidence the Court has considered in mitigation are aspects of the [sic] Mr. Israel's character, his record and other circumstances of the surrounding offense. In the Court's opinion nothing about this catch-all mitigating factor applies to Mr. Israel. His record is bad, his character worse, and the offense is horrible. The Court assigns no weight to this mitigating factor.
Although the trial court's sentencing order is conclusory in certain aspects, we find no reversible error in the trial court's treatment of the mitigation in this case.
We addressed a similar issue in Nelson v. State, 748 So.2d 237, 243-44 (Fla.1999). In Nelson, trial testimony indicated that the defendant had a history of alcohol and drug abuse. However, the defendant did not identify the substance abuse as a mitigating factor when he presented the mitigators to the trial court. Id. at 243. Relying on Consalvo v. State, 697 So.2d 805, 818 (Fla.1996), in Nelson this Court noted:
In Lucas v. State, 568 So.2d 18 (Fla. 1990), we stated: "[T]he defense must share the burden and identify for the court the specific nonstatutory mitigating circumstances it is attempting to establish." Id. at 24. Unlike statutory mitigation that has been clearly defined by the legislature, nonstatutory mitigation may consist of any factor that could reasonably bear on the sentence. The *392 parameters of nonstatutory mitigation are largely undefined. This is one of the reasons that we impose some burden on a party to identify the nonstatutory mitigation relied upon.
Nelson, 748 So.2d at 243-44 (quoting Consalvo, 697 So.2d at 818). Therefore, in Nelson we found the trial court did not err in failing to consider the defendant's history of alcohol and substance abuse as a separate nonstatutory mitigator. 748 So.2d at 244.
A review of the record in this case demonstrates that Israel failed to identify the areas of drug abuse, brain damage, and low intellectual functioning as specific nonstatutory mitigation for the trial court to consider. In fact, the trial court specifically referenced Dr. Krop's testimony in the discussion of the two statutory mental mitigators. Therefore, we find the trial court did not err and did not ignore the evidence.
Next, Israel attacks the constitutionality of his death sentence because the jury recommended death by a split vote of eleven to one. We have previously rejected this argument and do so again in this case. See Sexton v. State, 775 So.2d 923, 936 (Fla.2000); Hunter v. State, 660 So.2d 244, 252-53 (Fla.1995) (citing James v. State, 453 So.2d 786, 792 (Fla.1984)).
Finally, Israel argues his death sentence is disproportionate. Due to the uniqueness and finality of death, this Court addresses the propriety of all death sentences in a proportionality review. See Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). In deciding whether death is a proportionate penalty and to ensure uniformity in the imposition of the death sentence, this Court reviews and considers all the circumstances in a case relative to other capital cases. See Johnson v. State, 720 So.2d 232, 238 (Fla.1998); Urbin v. State, 714 So.2d 411, 416-17 (Fla. 1998). The death penalty is reserved for those cases that are the most aggravated and least mitigated. See Kramer v. State, 619 So.2d 274, 278 (Fla.1993); State v. Dixon, 283 So.2d 1 (Fla.1973).
In sentencing Israel to death, the trial court found and weighed four aggravating circumstances: (1) the defendant was previously convicted of another capital felony or of a felony involving the use or threat of use of violence to a person, (2) the crime was especially heinous, atrocious, or cruel, (3) the crime was committed while defendant was engaged in the commission of a sexual battery, burglary, and kidnaping, and (4) the capital felony was committed for pecuniary gain. The trial court also considered and weighed two statutory mitigators: (1) the defendant was under the influence of an extreme mental or emotional disturbance at the time the crime occurred; and (2) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.
In arguing that death is a disproportionate penalty in this case, Israel relies on Songer v. State, 544 So.2d 1010 (Fla.1989), Fitzpatrick v. State, 527 So.2d 809 (Fla. 1988), and Huckaby v. State, 343 So.2d 29 (Fla.1977). We find Songer to be of no comparable value to the instant case because Songer involved only one valid aggravating circumstance and significant mitigating factors. 544 So.2d at 1011.
In Fitzpatrick, the trial court found five aggravating circumstances (previously convicted of another capital felony or felony involving violence, knowingly created great risk of death to many persons, felony committed while in commission of kidnaping, felony committed for purpose of avoiding or preventing a lawful arrest, and felony committed for pecuniary gain), and three *393 statutory mitigating circumstances (under influence of extreme mental or emotional disturbance, capacity to appreciate criminality of conduct substantially impaired, and age of defendant at the time of the crime). 527 So.2d at 811. However, we vacated Fitzpatrick's death sentence because of other substantial mitigation in the record. Id. at 812. For example, those present at the scene of the crime testified that Fitzpatrick appeared psychotic, high, spacey, panicky, and wild. Fitzpatrick's family members and those who had known him throughout most of his life testified that he frequently talked to himself as if he were hearing voices. Moreover, it was the unanimous opinion of several mental and physical health experts that Fitzpatrick's emotional age was between nine and twelve years old, and thus we concluded, "Fitzpatrick's actions were those of a seriously emotionally disturbed man-child, not those of a cold-blooded, heartless killer." Id. at 812.
Israel asserts that when his case is compared to Fitzpatrick, his death sentence is disproportionate. We cannot agree. The mitigation presented in Fitzpatrick, especially that the defendant was characterized as a "seriously emotionally disturbed man-child," is simply not comparable to the two statutory mitigators found in the instant case. There is nothing in the record to suggest that Israel possessed an unusually low emotional age. Moreover, in Fitzpatrick we noted that the aggravating circumstances of heinous, atrocious or cruel (HAC) and cold, calculated, and premeditated (CCP) were conspicuously absent. Id. at 812. Here the trial court found four valid aggravators, including HAC. This case is not, as Israel asserts, one of the least aggravated.
In Huckaby, the trial court found three aggravating circumstances and no mitigating circumstances. We affirmed two of the three aggravators, but vacated the defendant's death sentence because the trial judge "ignored every aspect of the medical testimony ... when he found that no mitigating circumstances existed." 343 So.2d at 33. Also, we found that the heinous and atrocious manner in which the crime was committed in Huckaby was the direct consequence of the defendant's mental illness. Id. In the instant case, however, the trial court did not ignore the medical testimony presented. The trial court relied on Dr. Krop's testimony to support the two statutory mental mitigators. Israel's death sentence is not disproportionate when compared to Huckaby.
We conclude that the instant case is more like cases where we have upheld the defendant's death sentence in light of substantial aggravation and relatively little mitigation. See Hildwin v. State, 727 So.2d 193, 198 (Fla.1998) (death sentence proportionate where trial court properly found and weighed four aggravating circumstances (HAC, pecuniary gain, prior violent felony, and under sentence of imprisonment), two statutory mitigators (under the influence of extreme mental or emotional disturbance at time of murder, and capacity to conform conduct substantially impaired), and five nonstatutory mitigators (history of childhood abuse, history of drug or substance abuse, organic brain damage, ability to do well in a structured environment like prison, and mental illness was readily treatable in a prison setting)); Jones v. State, 748 So.2d 1012, 1017 (Fla. 1999) (death sentence proportionate where trial court properly found and weighed four aggravating circumstances (murder committed during course of kidnapping and robbery, previous violent felony, HAC, and murder committed to avoid arrest), two statutory mitigators (under the influence of extreme mental or emotional disturbance at time of murder, and capacity to appreciate criminality of conduct substantially *394 impaired), and three nonstatutory mitigators (defendant was a crack addict, defendant had a teenage daughter and was a good worker and provider when not using drugs, and defendant had exhibited signs of a psychotic episode)). Based on our review of the aggravating and mitigating circumstances, including their nature and quality, we find that the totality of the circumstances justifies the imposition of the death sentence. See Porter, 564 So.2d at 1064.

CONCLUSION
Based on the foregoing, we affirm Israel's conviction for the first-degree murder of Esther Hagans and the imposition of a sentence of death.
It is so ordered.
WELLS, LEWIS, and QUINCE, JJ., and HARDING, Senior Justice, concur.
ANSTEAD, C.J., concurs as to conviction, and concurs in result only as to sentence.
PARIENTE, J., concurs in result only with an opinion, in which SHAW, J., concurs.
PARIENTE, J., concurring in result only.
I concur in the denial of Israel's claim that the nonunanimous death recommendation renders his death sentence unconstitutional, for the same reasons as in my concurring-in-result-only opinions in Bottoson v. Moore, 833 So.2d 693, 719-25 (Fla. 2002), and King v. Moore, 831 So.2d 143, 149-56 (Fla.2002). Although I believe that Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), compels us to recede from our statement in Mills v. Moore, 786 So.2d 532, 537-38 (Fla.2001), that death is the maximum penalty authorized for a first-degree murder verdict under Florida law, this conclusion does not render Israel's sentence infirm.
Two aggravating circumstances were based on other convictions: a prior capital or violent felony, and a murder committed during a sexual battery, burglary or kidnapping. In Bottoson and King, we denied habeas relief to petitioners whose aggravating circumstances included prior violent felony convictions. The other-conviction aggravators in this case make it unnecessary to determine whether the nonunanimous jury recommendation renders Israel's death sentence unconstitutional. I cannot agree with the majority that the summary disposition of these constitutional claims in Sexton v. State, 775 So.2d 923, 936 (Fla.2000), and Hunter v. State, 660 So.2d 244, 252-53 (Fla.1995), remains valid authority for rejection of claims regarding nonunanimous jury recommendations in the wake of Ring. Accordingly, I concur in result only as to the affirmance of Israel's sentence on this issue.
SHAW, J., concurs.
NOTES
[1] Maryann Pittman was unavailable for Israel's second trial and thus her prior testimony was read into evidence.
[2] Spencer v. State, 615 So.2d 688 (Fla.1993).
[3] The aggravating circumstances were: (1) the defendant was previously convicted of another capital felony or of a felony involving the use or threat of use of violence to a person; (2) the crime was especially heinous, atrocious or cruel; (3) the crime was committed while the defendant was engaged in the commission of a sexual battery, burglary, and kidnaping; and (4) the capital felony was committed for pecuniary gain.
[4] The mitigating circumstances were: (1) the defendant was under the influence of an extreme mental or emotional disturbance at the time the crime occurred (some credence); and (2) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired (some credence).
[5] The motion for continuance will be discussed more fully with respect to Israel's second guilt phase claim.
[6] Israel also claims he advised defense counsel at lunch on Tuesday, February 23, that he (Israel) wished to participate in jury selection, and it was not until trial had recessed on Tuesday afternoon that he was informed, by a bailiff, that nine jurors had been selected. Defense counsel was questioned on Tuesday afternoon about Israel's wishes and indicated that Israel wished to remain in his holding cell. On Thursday, Israel complained to the trial court that "I also asked him [defense counsel], did you or the State pick any people in which I was to participate," but defense counsel did not respond to Israel's complaint nor did the trial court inquire of defense counsel after Israel's complaint. Therefore, whether defense counsel carried out Israel's wishes (if Israel did indeed inform defense counsel of his wishes), cannot be ascertained from this record.
[7] As a result of the altercation, the bailiff suffered lacerations on his nose and chin, as well as a torn and bleeding sclera, the white section of the eye.
[8] Williams v. State, 110 So.2d 654 (Fla.1959).