23 So.3d 87 (2009)
Troy VICTORINO, Appellant,
v.
STATE of Florida, Appellee.
No. SC06-2090.
Supreme Court of Florida.
November 25, 2009.
*91 James Jeffery Dowdy of Dowdy and Nielsen, Winter Springs, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, FL, and Kenneth S. Nunnelley, Assistant Attorney General, Daytona Beach, FL, for Appellee.
PER CURIAM.
Troy Victorino appeals his convictions and sentences of death for first-degree murder. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm.

I. BACKGROUND
On August 27, 2004, Victorino was charged in a fourteen-count superseding indictment that included six counts of first-degree murder in the deaths of Erin Belanger, Roberto Gonzalez, Michelle Nathan, Anthony Vega, Jonathon Gleason, and Francisco "Flaco" Ayo-Roman. Victorino, with codefendants Jerone Hunter and Michael Salas, went to trial on July 5, 2006.[1] Codefendant Robert Anthony Cannon previously pleaded guilty as charged.

A. The Guilt Phase
The evidence presented at trial established that the August 6, 2004, murders were the culmination of events that began several days before. On Friday, July 30, Erin Belanger contacted police concerning suspicious activity at her grandmother's vacant house on Providence Boulevard in Deltona. Without the owner's permission, Victorino and Hunter had recently moved into the home with their belongings. On Saturday, Belanger again contacted police; this time she reported that several items were missing from her grandmother's house.
Late Saturday night, Victorino appeared at Belanger's own residence on Telford Lane. He demanded the return of his belongings, which he believed Belanger had taken from the Providence Boulevard residence. Shortly after leaving Belanger's residence early on the morning of Sunday, August 1, Victorino contacted law enforcement to report the theft of his belongings from the Providence Boulevard residence. The responding officer advised Victorino that he had to provide a list of the stolen property. This angered Victorino, and he said, "I'll take care of this myself."
A short time later, Victorino met Brandon Graham and codefendants Cannon and Salas, who were in Cannon's Ford Expedition (the SUV). Codefendant Hunter and several young women were also in the SUV. Victorino told them that Belanger and the other occupants of the Telford Lane house had stolen his belongings and that he wanted them to go fight Belanger and the others. According to Graham, Victorino and the occupants of the SUV all *92 went in the SUV to the Telford Lane residence. While Victorino remained in the SUV, the young women went into the residence armed with knives. The young men stood outside holding baseball bats, and Hunter yelled for the occupants to come out and fight. The group left in Cannon's SUV, however, after victim Ayo-Roman yelled "policia."
A few days later, on the evening of Wednesday, August 4, Victorino went to a park with Graham and the three codefendants to fight another group. Evidence was presented that some of the members of that group were affiliated with the victims at Telford Lane and would have knowledge of Victorino's allegedly stolen property. When their foes failed to show up, Victorino and his associates drove back to a house on Fort Smith Boulevard in Deltona where Victorino and Hunter now lived. As they arrived, however, Victorino spotted the car of the group with which the fight was planned and directed Cannon, who was driving, to chase the car. Victorino fired a gunshot at the fleeing car and then told Cannon to take him home.
The following morning, Thursday, August 5, Graham, Salas, and Cannon met with Victorino and Hunter at their residence. There, Victorino outlined the following plan to obtain his belongings from Belanger. Victorino said that he had seen a movie named Wonderland in which a group carrying lead pipes ran into a home and beat the occupants to death. Victorino stated that he would do the same thing at the Telford Lane residence. He asked Graham, Salas, and Cannon if they "were down for it" and said to Hunter, "I know you're down for it" because Hunter had belongings stolen as well. All agreed with Victorino's plan. Victorino described the layout of the Telford Lane residence and who would go where. Victorino said that he particularly wanted to "kill Flaco," and told the group, "You got to beat the bitches bad." Graham described Victorino as "calm, cool-headed." Hunter asked if they should wear masks; Victorino responded, "No, because we're not gonna leave any evidence. We're gonna kill them all."
Victorino and his associates then left in Cannon's SUV to search for bullets for the gun that Victorino fired the previous night. While driving, the group further discussed their plan and decided that each of them needed a change of clothes because their clothes would get bloody. The group dropped Graham off at his friend Kristopher Craddock's house. Graham avoided the group's subsequent calls and did not participate in the murders.
Around midnight on Thursday, August 5, a witness saw Victorino, Salas, Cannon, and Hunter near the murder scene on Telford Lane. Cannon, a State witness, testified that he and Salas went because they were afraid Victorino would kill them if they did not. Cannon further testified that he, Victorino, Hunter, and Salas entered the victims' home on the night of the murders armed with baseball bats.
On the morning of Friday, August 6, a coworker of two of the victims discovered the six bodies at the Belanger residence and called 911. Officers responding to the 911 call arrived to find the six victims in various rooms. The victims had been beaten to death with baseball bats and had sustained cuts to their throats, most of which were inflicted postmortem. Belanger also sustained postmortem lacerations through her vagina up to the abdominal cavity of her body, which were consistent with having been inflicted by a baseball bat. The medical examiner determined that most of the victims had defensive wounds. The front door had been kicked in with such force that it broke the deadbolt lock and left a footwear impression on the door. Footwear impressions were also *93 recovered from two playing cards, a bed sheet, and a pay stub. All of these impressions were linked to Victorino's Lugz boots. Furthermore, DNA testing linked bloodstains on Victorino's Lugz boots to several of the victims. A dead dachshund, a knife handle, and a bloody knife blade were also recovered from the crime scene.
On Saturday, August 7, the day after the murders were discovered, Victorino was arrested on a probation violation at his residence on Fort Smith Boulevard. Hunter, who was present at the time, complied with the officers' request that he come to the sheriff's office. Once there, Hunter described his role in the murders. That same day, Cannon's SUV was seized. From it, officers recovered a pair of sunglasses containing victim Ayo-Roman's fingerprint. In addition, glass fragments found in the vehicle were consistent with glass from a broken lamp at the crime scene.
When questioned by officers, Salas admitted to being at the crime scene on the night of the murders and stated that Cannon drove there with Victorino, Hunter, and Salas. Salas also described his role in the murders and told officers where the bats had been discarded at a retention pond. Based on that information, law enforcement authorities recovered two bats from the pond and two bats from surrounding trees. The two bats recovered from surrounding trees contained DNA material that was linked to at least four of the victims.
At trial, Victorino testified in his defense. He admitted that he believed that Belanger had taken his property from the Providence Boulevard residence. However, he denied meeting Graham, Cannon, or Salas at his residence on August 5, testifying instead that he was at work. He further denied committing the murders and offered an alibithat he was at a night-club on the night of the murders. Two friends testified on behalf of Victorino and corroborated his alibi.
Hunter and Salas also testified in their defense. Each described his role in the murders and corroborated the other testimony and evidence offered at trial, including the evidence of the meeting at which Victorino planned the murders and the agreement to participate. They further testified that Victorino attempted to establish an alibi by making an appearance at the nightclub.
On July 25, 2006, Victorino was convicted of six counts of first-degree murder (Counts II-VII); one count of abuse of a dead human body (Count VIII); one count of armed burglary of a dwelling (Count XIII); one count of conspiracy (to commit aggravated battery, murder, armed burglary of a dwelling, and tampering with physical evidence) (Count I); and one count of cruelty to an animal (Count XIV).

B. The Penalty Phase
At the beginning of the penalty phase, the trial court informed the jury of the parties' stipulation that Victorino was on felony probation for aggravated battery at the time of the murders. After the State introduced victim impact statements by the victims' family members, the defendant presented several witnesses.
Victorino began by presenting the testimony of three expert witnesses. Dr. Joseph Wu, a psychiatrist, concluded that a PET (Positron Emission Tomography) scan revealed Victorino's brain was abnormal, evidencing lower than normal frontal lobe activity. While he did not make a diagnosis, he said that the scan was consistent with traumatic brain injury or mental health conditions, such as bipolar disorder or schizophrenia. After reviewing Victorino's records and conducting numerous tests, Dr. Charles Golden, a neuropsychologist, *94 determined that Victorino has some frontal lobe impairment and severe emotional problems. Although Victorino has average intelligence and knows right from wrong, he performed poorly on executive function tests, has difficulty with interpersonal relationships, and has poor coping skills. Dr. Golden opined that the test results were consistent with Victorino's personal history of physical abuse, difficulty in controlling his aggression, and lack of mental health treatment. Finally, the third defense expert, Dr. Jeffrey Danziger, a psychiatrist, testified that Victorino has an IQ of 101 and outlined Victorino's long history of physical and emotional abuse by his father, an incident of sexual abuse, his history of mental health problems (including his several suicide attempts), and his time in prison.
Several relatives and friends also testified. Victorino's brother and mother also told of Victorino's mental health problems, an instance of sexual abuse, and the frequent physical abuse by his father. In addition, two friends testified about their regard for him.
In rebuttal, the State presented Dr. Lawrence Holder, an expert in radiology and nuclear medicine. He testified that Victorino's PET scan was normal. Further, he stated that use of a PET scan to suggest that a patient has a specific mental health problem, such as bipolar disorder, is not an established clinical use of such scans.
The jury recommended life sentences for the murders of Michelle Nathan and Anthony Vega and death sentences for the murders of Erin Belanger (by a vote of ten to two), Francisco Ayo-Roman (by a vote of ten to two), Jonathan Gleason (by a vote of seven to five), and Roberto Gonzalez (by a vote of nine to three). At the subsequently held Spencer[2] hearing, the State submitted an additional written victim impact statement. Victorino did not present any additional evidence.
On September 21, 2006, the trial court followed the jury's recommendations by imposing four death sentences.[3] The trial court found the following five aggravating factors applicable to each of the four murders and accorded them the weight indicated: (1) the defendant had a prior felony conviction and was on probation at the time of the murders (moderate weight); (2) the defendant had other capital felony convictions (very substantial weight); (3) the defendant committed the murders in the course of a burglary (moderate weight); (4) the murders were especially heinous, atrocious, or cruel (HAC) (very substantial weight); and (5) the murders were cold, calculated, and premeditated (CCP) (great weight). In addition, the court found a sixth aggravator in the murders of Gleason and Gonzalezthat the murders were committed to avoid arrest (substantial weight). The trial court found no statutory mitigation but did find the following nonstatutory mitigating factors: (1) Victorino had a history of mental illness (some weight); (2) he suffered childhood physical, sexual, and emotional abuse (moderate weight); (3) he was a devoted family member with family support (little weight); (4) he did some good deeds (very *95 little weight); (5) he exhibited good behavior at trial (very little weight); (6) he was a good inmate (little weight); (7) he was a good student who earned awards (little weight); (8) he had an alcohol abuse problem (very little weight); and (9) he had a useful occupation (very little weight). The trial court determined that the aggravating factors far outweighed the mitigating circumstances and, in accord with the jury's recommendation, sentenced Victorino to death for each of the four murders.

II. GUILT PHASE CLAIMS
Regarding the guilt phase, Victorino argues that the trial court erred in (A) denying his pretrial motion to suppress DNA samples and nail scrapings, which he claimed were forcibly obtained from him; (B) denying his motion to suppress physical evidence seized from his Fort Smith Boulevard residence; (C) denying his motion to sever his trial from that of his two codefendants; (D) admitting evidence of uncharged misconduct; (E) using the "and/or" conjunction between the names of the codefendants when instructing the jury; (F) moving the trial within the Seventh Circuit from Volusia County to St. Johns County after granting a motion to change venue; (G) denying his request for additional peremptory challenges; (H) denying his motion for mistrial when his codefendant testified; (I) denying his motion for judgment of acquittal; and (J) denying him due process in his arrest and service of the warrant and admitting irrelevant evidence. Each argument will be addressed in turn.

A. Motion to Suppress DNA
Victorino argues that the trial court erred in denying his pretrial motion to suppress DNA samples and nail scrapings, which he claimed were forcibly obtained from him.[4] After holding an evidentiary hearing, the trial court held that Victorino freely and voluntarily provided DNA samples and nail scrapings. We agree.
At the motion hearing, Victorino testified that after he was taken into custody, he was placed in an interview room. Victorino admits that he was properly advised of his Miranda[5] rights and that he agreed to give an interview. Victorino testified, however, that he refused the subsequent request of two uniformed investigators to provide DNA samples, saying he would not comply without a warrant. According to Victorino, Investigator Richard Graves then pried Victorino's mouth open while Investigator Charles Dowell swabbed Victorino's cheek; then, Dowell held Victorino's hand down, while Graves took nail scrapings.
In contrast, Investigator Graves testified that when he asked to collect the samples, Victorino first stated that his DNA was already on record. When Graves indicated that he was unaware of that record, Victorino complied with the request, opening his mouth for the swab and allowing the collection of nail scrapings. According to Graves, Victorino never refused and was cooperative at all times. Investigator Dowell's testimony was completely consistent with the testimony of Graves. In addition, Sergeant Robert Kelly, who was standing outside the room's open door, testified that Victorino never asked that the sample not be taken, never said anything about a search warrant, and never resisted. Instead, Victorino was very cooperative and polite. The trial court specifically found the officers' *96 testimony to be more credible than Victorino's testimony.
In reviewing a trial court's order on a motion to suppress, this Court "presumes that a trial court's findings of fact are correct and reverses those findings only if they are not supported by competent, substantial evidence. Appellate review of the trial court's application of the law to the historical facts is de novo." Cuervo v. State, 967 So.2d 155, 160 (Fla. 2007) (citation omitted) (citing Connor v. State, 803 So.2d 598, 608 (Fla.2001)).
In this case, the trial court's findings that Victorino freely and voluntarily consented to providing DNA samples and fingernail scrapings are supported by competent, substantial evidence. Graves, Dowell, and Kelly testified that Victorino was cooperative and neither refused to give the samples nor demanded that the investigators first obtain a warrant. Furthermore, the trial court specifically found the investigators to be more credible than Victorino. Accordingly, we affirm the trial court's denial of Victorino's motion to suppress DNA samples and nail scrapings.

B. Motion to Suppress Physical Evidence
Victorino argues that the trial court erred in denying his motion to suppress physical evidence seized from his Fort Smith Boulevard residence. Although Victorino does not identify the physical evidence at issue, the trial court's order does: a pair of size twelve Lugz brown boots. In his motion, Victorino alleged two grounds for suppression: (1) the affiant made reckless or false statements in the warrant affidavit; and (2) the warrant failed to specify with particularity the items to be seized. After conducting a hearing, the trial court denied Victorino's motion, holding that "[t]here is no testimony or even suggestion that the information provided by [the affiant] was anything other than forthright and reliable." The trial court also denied Victorino's claim that the warrant lacked sufficient particularity.
On appeal, Victorino raises only the first groundthat the affiant made reckless or false statements in the warrant affidavit.[6] We reviewed and rejected an identical claim as to this same warrant in Hunter because Hunter made no showing "that the affidavit contains statements that were intentionally false or made with reckless disregard for the truth." 8 So.3d at 1065 (quoting Pardo v. State, 941 So.2d 1057, 1066-67 (Fla.2006)). Victorino likewise failed to make the necessary factual showing to support his claim. Accordingly, the trial court did not err in denying Victorino's motion to suppress physical evidence.

C. Motion to Sever
Victorino argues that the trial court erred in denying his motion to sever his trial from that of his two codefendants. Specifically, Victorino contends that the failure to sever resulted in jury confusion because of the enormity of the prosecution and the antagonistic defenses of the individual codefendants. Victorino also summarily claims that even if the trial court properly refused to sever the codefendants' trial during the guilt phase, the trial should have been severed at the penalty phase. Finally, without articulating a ground for trial court error, Victorino describes his pretrial argument that the motion to sever should have been granted because certain statements made by the codefendants during their confessions were inadmissible under Bruton v. United *97 States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).
We reviewed and rejected similar claims in Hunter. In Hunter, we explained that the trial court complied with the Florida Rules of Criminal Procedure regarding the defendants' motions to sever:
Florida Rule of Criminal Procedure 3.152(b)(1)(A) directs that severance between defendants before trial shall be granted upon a showing that the order is necessary to protect a defendant's right to a speedy trial or is appropriate to promote a fair determination of the guilt or innocence of one or more defendants. Pursuant to subpart (b)(2) of the rule, upon a defense motion, the court must determine if the State intends to introduce evidence of a statement that makes reference to another defendant that is not admissible as to the moving defendant. If so, the rule
requires the State to elect one of three courses: (1) a joint trial at which evidence of the statement is not admitted; (2) a joint trial at which evidence of the statement is admitted after all references to the moving defendant have been deleted, provided the court determines that admission of the evidence with deletions will not prejudice the moving defendant; or (3) severance of the trial.

Smith v. State, 699 So.2d 629, 643 (Fla. 1997). Under the facts of this case, the trial court complied with rule 3.152(b)(2).
Hunter, 8 So.3d at 1068.
In Hunter, the defendantwho had failed to preserve the argumentcontended that failure to sever resulted in jury confusion and inconsistent defenses. Concluding that even if the argument had been preserved it was meritless, we explained that
[w]hether the defendants could possibly have antagonistic defenses would not in itself justify severance of codefendants. See Lugo v. State, 845 So.2d 74, 97 n. 41 (Fla.2003). "A strategic advantage or hostility among defendants does not, by itself, require severance." Coleman v. State, 610 So.2d 1283, 1285 (Fla.1992). "If the defendants engage in a swearing match as to who did what, the jury should resolve the conflicts and determine the truth of the matter.... [T]he defendants are confronting each other and are subject to cross-examination upon testifying, thus affording the jury access to all relevant facts." McCray v. State, 416 So.2d 804, 806 (Fla.1982). As stated, each defendant testified at trial; Salas and Hunter provided conflicting testimony as to who did what, while Victorino denied any involvement in the crimes. Moreover, "the fact that the defendant might have a better chance of acquittal or a strategic advantage if tried separately does not establish the right to a severance." Id.

Hunter, 8 So.3d at 1069 (alteration in original). The same analysis applies here. Victorino is not entitled to severance simply because his codefendants are shifting the blame onto him. Furthermore, as we stated in Hunter, "Though all three defendants were similarly charged, the jury clearly differentiated between them in its verdicts." Id.
Hunter also raised the unpreserved argument on appeal that even if the trial court properly refused to sever the defendants during the guilt phase the trial should have been severed at the penalty phase. Id. We concluded that on the merits this argument would be unavailing. We explained that since the jury differentiated between the defendants in both the guilt and penalty phases, Hunter would not be entitled to relief. Id. Similarly, Victorino is not entitled to relief on this argument.
*98 Finally, although Victorino describes his pretrial argument that the motion to sever should have been granted because certain statements made by the codefendants during their confessions were inadmissible under Bruton, he fails to adequately brief that argument on appeal or identify the codefendant statements that would otherwise have been inadmissible if he had been tried alone.[7] Accordingly, Victorino has waived this argument for appeal. See Duest v. Dugger, 555 So.2d 849, 851-52 (Fla.1990); Coolen v. State, 696 So.2d 738, 742 n. 2 (Fla.1997).

D. Evidence of Uncharged Misconduct
Victorino argues that the trial court erred in admitting extrinsic evidence. First, Victorino contends that the trial court erred in admitting Brandon Graham's testimony that on Wednesday, August 4, Graham, Victorino, Hunter, Salas, Cannon, and others went to a park in Cannon's SUV to fight another group of individuals (opposition group). Second, Victorino challenges Graham's testimony that after leaving the park, Victorino and his associates ran into the opposition group at Victorino's residence and Victorino fired one gunshot at the group during a car chase. We reject the claim that this evidence was similar fact evidence subject to the requirements of section 90.404(2), Florida Statutes (2004). We hold that the trial court was correct in admitting Graham's testimony as relevant pursuant to section 90.402, Florida Statutes (2004), to show the circumstances leading up to the commission of the murders.[8]
A trial court's determination that evidence is relevant and admissible "will not be disturbed absent an abuse of discretion." Taylor v. State, 855 So.2d 1, 21 (Fla.2003) (quoting Sexton v. State, 697 So.2d 833, 837 (Fla.1997)). Generally, all relevant evidence is admissible, unless excluded by law. § 90.402, Fla. Stat. (2004). "Relevant evidence is evidence tending to prove or disprove a material fact." § 90.401, Fla. Stat. (2004). "Similar fact evidence of other crimes, wrongs or acts is admissible when relevant to prove a material fact in issue, ... but it is inadmissible when the evidence is relevant solely to prove bad character or propensity." § 90.404(2)(a), Fla. Stat. (2004). "Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." § 90.403, Fla. Stat. (2004).
Admissible evidence of uncharged crimes falls into two categories: "`similar fact' evidence and `dissimilar fact' evidence." Zack v. State, 753 So.2d 9, 16 (Fla.2000). Similar fact evidence is governed by the requirements and limitations of section 90.404, and dissimilar fact evidence is governed by the general rule of *99 relevancy set forth in section 90.402. As we explained in Sexton v. State, 697 So.2d 833, 837 (Fla.1997):
[S]ection 90.404 is a special limitation governing the admissibility of similar fact evidence. But if evidence of a defendant's collateral bad acts bears no logical resemblance to the crime for which the defendant is being tried, then section 90.404(2)(a) does not apply and the general rule in section 90.402 controls.
"[W]hether the evidence of other bad acts" falls into the category of "`similar fact' evidence or `dissimilar fact' evidence, its admissibility is determined by its relevancy." Zack, 753 So.2d at 16. Both types of evidence of uncharged crimes or other misconduct are, of course, subject to exclusion under the balancing test of section 90.403.
Here, the evidence at issuewhich recounted events leading up to the murder was not similar fact evidence. Graham's testimony regarding the planned fight and the shooting incident is evidence of acts that "bear[ ] no logical resemblance to the crime [of murder] for which [Victorino] [was] being tried." Sexton, 697 So.2d at 837. Accordingly, section 90.404(2) does not apply.
Dissimilar fact evidence of uncharged misconductwhich is governed by section 90.402's general rule of relevancy is admissible to "establish[] the relevant context in which the [charged] criminal acts occurred." Caruso v. State, 645 So.2d 389, 394 (Fla.1994). "[T]o prove its case, the State is entitled to present evidence which paints an accurate picture of the events surrounding the crimes charged." Griffin v. State, 639 So.2d 966, 970 (Fla. 1994). Accordingly, evidence of uncharged misconduct is relevant when its admission is "necessary to adequately describe the events leading up to" the commission of the charged offense. Id.
The evidence here showed a continuing chain of events leading up to the murders. In a written order, the trial court explained that Victorino and his codefendants acted as a group in avenging the wrongs suffered by members of the group. The August 1 raid on Belanger's Telford Lane residence by the gang of young men under Victorino's direction was the beginning of an extended confrontation that culminated in the murders. Furthermore, the facts surrounding the incident at the park and subsequent gunshot were relevant to motive and premeditation, which were issues at trial. Evidence was presented that some of the members of the opposition group were affiliated with the victims at Telford Lane and would have knowledge of Victorino's allegedly stolen property. For example, Kristopher Craddock testified that Victorino and Hunter went to the park because they thought some of the members of the opposition group were involved in the theft of their property. Thus, Victorino's firing a gunshot at the opposition group was relevant to Victorino's intent. Moreover, the gun Victorino fired was the same gun that the group intended to use during the murders and for which they searched for bullets the next day. These facts were all "necessary to adequately describe the events leading up to" the commission of the murders. Id.
This case is analogous to Foster v. State, 679 So.2d 747, 750 (Fla.1996). In Foster, a prosecution for murder, a codefendant recruited the defendant and another codefendant to commit robberies in an effort to repay a gambling debt. The State presented evidence that the trio proceeded to rob three unknown men of personal items, including drugs and a vehicle. Id. The defendant and another codefendant then sold some of the stolen drugs. Id. The *100 group, which then included a fourth codefendant, agreed to find another local drug dealer to rob. Id. When they were unable to locate another drug dealer, the group decided to rob other victims. Id. Testimony revealed that the defendant and a codefendant drank liquor and smoked marijuana during this episode. Id. During this time, a plan was hatched to rob an entire bar. Id. After abandoning this plan, the group decided to follow an SUV, which was occupied by the eventual murder victims. Id. After ramming into the back of the SUV with the previously stolen vehicle, the defendants kidnapped and killed two of the victims while injuring another. Id. at 750-51. Concluding that the evidence of the events prior to the murder "showed a continuing chain of chronological events," we held that the evidence was properly admissible beginning with the initial recruitment, where the defendant first got involved, and ending with the murders. Id. at 753. We stated that "[t]he State can present to the jury the complete picture of the criminal episode, and the evidence of the earlier crimes was admissible on this basis." Id. Moreover, we held in Foster that the evidence of the uncharged crimes was relevant to show the defendant's "motive and, ultimately, his intent." Id.
Here, as in Foster, the State was properly permitted to present the complete picture of the criminal episode. The incident at the park and subsequent gunshot took place as part of Victorino's and Hunter's successive and violent attempts to get their property back. Although there was testimony presented at trial that the group reorganized at the park to avenge Cannon's and Salas's honor, there was also testimony that Victorino went to the park to confront the individuals who had taken his property. The record also reveals that the probative value of the evidence was not "substantially outweighed" by the "danger of unfair prejudice." § 90.403. On this record, we cannot say that the trial court abused its discretion in admitting the challenged evidence.

E. "And/Or" Instructions
Victorino raises instructional error during the guilt phase. For each of the instructions defining a criminal offense, where an element provided for inclusion of the name of the defendant, the trial court instructed as follows: "TROY VICTORINO and/or JERONE HUNTER and/or MICHAEL SALAS." Victorino argues that the use of the "and/or" conjunction between the names of codefendants in the jury instructions was error because the jury may have convicted Victorino solely upon a finding that a codefendant's conduct satisfied an element of the charged offenses.
Victorino objected to the use of "and/or" in the jury instructions for the charges of conspiracy, premeditated first-degree murder, abuse of a dead human body, and burglary. The State correctly concedes that this issue was preserved, but argues that any error was harmless. Victorino, however, did not object to the use of "and/ or" in the jury instructions for felony murder or cruelty to animals. Accordingly, with regard to these instructions, the argument is not preserved.
In Hunter, we acknowledged "that use of the conjunction `and/or' in jury instructions is error." 8 So.3d at 1070. Similarly, in codefendant Salas's case, the Fifth District held that use of "and/or" was error, reasoning that "the `and/or' conjunction may mislead the jury into believing it can convict the defendant based solely on the acts of his codefendant." Salas, 972 So.2d at 950. Consistent with this precedent, we hold that the trial court erred in using the "and/or" conjunction when it instructed the jury. Accordingly, with regard to Victorino's preserved claim, the *101 question is whether giving the erroneous instructions was harmless. Randolph v. State, 853 So.2d 1051, 1065 (Fla.2003); Jennings v. State, 782 So.2d 853, 862-63 (Fla.2001). An error in a jury instruction is harmless if there is "no reasonable possibility that the faulty instruction contributed to the verdict." Hunter, 8 So.3d at 1071 (citing State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986)).
In accordance with Standard Jury Instruction (Criminal) 3.12(c), the jury was instructed that the charges against each defendant, and the evidence applicable to that person, must be considered separately. The jury was further instructed that "[a] finding of guilty or not guilty as to one must not affect your verdict as to any other of the crimes charged." Furthermore, the evidence of Victorino's involvement in the conspiracy, premeditated first-degree murder, and burglary was overwhelming. See Hunter, 8 So.3d at 1071 (observing in harmless error analysis that "[t]he evidence of Hunter's involvement in the conspiracy was overwhelming"). And, while eyewitness testimony of abuse of a dead human body was limited to the testimony of Hunter and Salas, it is clear from the verdicts that the jury was able to differentiate between the defendants. Significantly, the jury acquitted Salas of all five counts regarding abuse of a dead human body, convicted Victorino of that offense in relation to victim Belanger, and convicted Hunter of that offense in relation to victims Gleason and Vega. See id. (stating in harmless error analysis that "it is clear from the verdicts on the abuse of a dead human body counts that the jury was able to differentiate between the defendants").
As the Fifth District stated in Salas, "it is the confluence of the instructions in their entirety, the evidence, and the individualized verdicts which render the error in the use of the `and/or' conjunction harmless in this prosecution." 972 So.2d at 954. Moreover, the jury was presented with individualized verdict forms and, in his closing arguments, Victorino's counsel argued that "[t]here's three different verdict forms. Three separate verdict forms. You judge him, him, and him on their own individual testimony and evidence against them." On this record, we are convinced beyond a reasonable doubtas we were in Hunterthat the instructional error did not contribute to the verdicts.
As stated previously, Victorino did not preserve his claim of error regarding the use of "and/or" in the jury instructions for felony murder or cruelty to animals. Thus, he cannot obtain relief unless giving the faulty instructions constitutes fundamental error. "Fundamental error in a jury instruction requires that the error `reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.'" Hunter, 8 So.3d at 1070 (quoting Garzon v. State, 980 So.2d 1038, 1042 (Fla.2008)). In Hunter, we determined that, based on the totality of the circumstances, the instructional error of using "and/or" in the felony murder instruction was not fundamental. Id. As in Hunter, the evidence at trial including the testimony of Brandon Graham, the forensic evidence, and the testimony of codefendants Salas and Hunter not only revealed that Victorino devised the plan to break into the Telford Lane residence and kill the occupants, but also that Victorino was present and participated in killing the occupants. Moreover, the State briefly addressed the principals instruction, explaining that "if someone helps someone else commit a crime, then they must be treated the same as ifthe actual perpetrator." Furthermore, with regard to the cruelty to animals instruction, *102 the jury convicted Victorino of this charge and acquitted his codefendants. Accordingly, we hold that under the totality of these circumstances the improper use of "and/or" in the felony murder, cruelty to animals, and principals instructions does not constitute fundamental error.

F. Venue
Victorino argues that the trial court abused its discretion in moving the trial within the Seventh Circuit from Volusia County to St. Johns County after it granted a motion to change venue. According to Victorino, the trial should have been moved to a different judicial circuit. Victorino waived this claim for appellate review when he failed to object on this basis in the trial court. At the hearing on the motion for a change of venue, the trial court discussed the possibility of moving the trial to St. John's County or other counties, including Alachua and Miami-Dade. Victorino's counsel acknowledged his own familiarity with the courthouse in St. John's County and one of the judges there, and stated he was willing to "accept whatever Your Honor thinks is best." The trial court specifically asked for any objection to moving the trial to St. John's County, but no defense attorney objected. Accordingly, Victorino is not entitled to relief on this claim.

G. Peremptories
Victorino contends the trial court violated his right to a fair and impartial jury by denying his request for additional peremptory challenges. The trial court granted the State a total of thirty peremptory challenges and gave ten peremptory challenges each to Victorino, Salas, and Hunter. The trial court's allocation of peremptory challenges complied fully with the requirements of Florida Rule of Criminal Procedure 3.350 that ten peremptory challenges are allowed "if the offense charged is punishable by death or imprisonment for life," rule 3.350(a)(1), and that where "2 or more defendants are jointly tried ... the state shall be allowed as many challenges as are allowed to all of the defendants," rule 3.350(b). See also § 913.08, Fla. Stat. (2005).
Victorino does not argue based on the multiple counts charged against him that "extenuating circumstances" warranted granting him additional challenges pursuant to rule 3.350(c). And he has failed to make any showing that the trial court abused its discretion under rule 3.350(e), which provides that "[t]he trial judge may exercise discretion to allow additional peremptory challenges when appropriate." Victorino has not demonstrated any error and accordingly is entitled to no relief.

H. Motion for Mistrial Based on Codefendant's Testimony
Victorino contends that the trial court's denial of his motion for mistrial was erroneous because Victorino's rights under the Sixth Amendment to confrontation and cross-examination were violated when a State witness, Cannon, the fourth perpetrator, refused to be cross-examined. Victorino argues that he was prejudiced as a result because Cannon implicated Victorino during his direct testimony. We reviewed and rejected a similar claim in Hunter. 8 So.3d at 1065-66. Here, as in Hunter, the Sixth Amendment argument was not presented to the trial court. Victorino is not entitled to relief on this unpreserved argument.

I. Motion for Judgment of Acquittal
Victorino argues that the trial court erred in denying his motion for judgment of acquittal. Although he concedes that DNA matching his profile was discovered in the Lugz boots, Victorino contends that evidence of another person's DNA that was found inside the Lugz boots supports *103 his theory that someone else wore his Lugz boots at the time of the murders. Victorino relies on this point to support his contention that the denial of his motion for judgment of acquittal was erroneous. The record reveals, however, that Victorino never made this argument to the trial court.
At the close of the State's case-in-chief, defense counsel moved for a judgment of acquittal stating, without elaboration, that there was "insufficient evidence against Mr. Victorino." The trial court denied the motion without hearing argument from the State. When defense counsel renewed the motion for judgment of acquittal at the close of the defense case-in-chief, defense counsel simply referred to his previous motion without articulating any specific grounds for it.
Florida Rule of Criminal Procedure 3.380(b) states that a motion for judgment of acquittal "must fully set forth the grounds on which it is based." (Emphasis added.) See Archer v. State, 613 So.2d 446, 448 (Fla.1993) (holding argument that motion for judgment of acquittal was erroneously denied was not preserved where specific grounds argued on appeal were not raised in the trial court); see also Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982). In this case, defense counsel's boilerplate motion for judgment of acquittal failed to present the grounds he now raises on appeal. Accordingly, this claim is not preserved for appellate review.
Nevertheless, we have reviewed the sufficiency of evidence regarding Victorino's first-degree murder convictions. See Deparvine v. State, 995 So.2d 351, 376 (Fla. 2008) ("[T]his Court will `independently review the evidence to determine whether sufficient evidence exists to support a first-degree murder conviction.'" (quoting Snelgrove v. State, 921 So.2d 560, 570 (Fla. 2005))); see also Fla. R.App. P. 9.142(a)(6). Based on the facts set out in Part I of this opinion, we conclude that Victorino's first-degree murder convictions are supported by competent, substantial evidence.

J. Due Process and Irrelevant Evidence
Although it is not entirely clear from his briefs, Victorino appears to argue that he was denied due process regarding his arrest and service of the warrant. Moreover, Victorino argues that there were twenty-three instances of irrelevant evidence admitted against him. These points are presented in a conclusory manner. We have previously stated that "[t]he purpose of an appellate brief is to present arguments in support of the points on appeal." Duest v. Dugger, 555 So.2d 849, 852 (Fla.1990); see also Coolen v. State, 696 So.2d 738, 742 n. 2 (Fla.1997). Victorino's failure to fully brief and argue these points constitutes a waiver of these claims.

III. PENALTY-PHASE CLAIMS
With regard to the penalty phase, Victorino argues on appeal that both the HAC and CCP aggravators are unconstitutional and inapplicable in his case; that the statutory mental health mitigator applies in his case; and that his sentences are disproportionate to those of his codefendants. He also contends that Florida's death penalty scheme is unconstitutional and that he should be retried because of the cumulative effect of the errors that occurred in the trial court. As explained below, each of his claims is meritless.

A. HAC
Victorino challenges the HAC aggravating factor on two grounds, arguing that the aggravator itself is unconstitutional and that it is unsupported by the evidence in this case. Victorino's challenge fails on both grounds.
*104 Citing Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), Victorino first contends that Florida's HAC aggravator is constitutionally infirm because it is overbroad and vague. See § 921.141(5)(h), Fla. Stat. (2005) ("The capital felony was especially heinous, atrocious, or cruel."). In Espinosa, the Supreme Court held that our prior jury instruction on this aggravator was unconstitutionally vague. However, in Hall v. State, 614 So.2d 473, 478 (Fla. 1993), this Court upheld the statute against this same challenge, and we have repeatedly affirmed that holding. See Francis v. State, 808 So.2d 110, 134 (Fla. 2001) (explaining that in Hall this Court "reasoned that the [new] instruction provided sufficient guidance so as to save both the instruction and the aggravator from a vagueness challenge"); Walker v. State, 707 So.2d 300, 316 (Fla.1997) ("[T]he standard instruction given in this case is the same instruction this Court approved in Hall and found sufficient to overcome vagueness challenges to both the instruction and the aggravator." (citation omitted)); Power v. State, 605 So.2d 856, 864 & n. 10 (Fla.1992). We also reject Appellant's contention that our ascribing to the words of the statute their plain and ordinary meaning violates the constitutional separation of powers.
Victorino next argues that the finding of the HAC aggravator in this case is unsupported by the evidence. Appellant contends that the murders were committed by stealth and that each victim was rendered immediately unconscious or dead with the first blow of a baseball bat to the head. He claims the murders were thus "execution-style" murders ineligible for the HAC aggravator. See Hartley v. State, 686 So.2d 1316, 1323 (Fla.1996). We disagree.
We review the finding of a statutory aggravator to determine whether the trial court applied the correct rule of law and whether its finding is supported by competent, substantial evidence. Hudson v. State, 992 So.2d 96, 115 (Fla.2008), cert. denied, ___ U.S. ___, 129 S.Ct. 1360, 173 L.Ed.2d 621 (2009); Alston v. State, 723 So.2d 148, 160 (Fla.1998). The HAC aggravator applies to a murder that is "both conscienceless or pitiless and unnecessarily torturous to the victim." Richardson v. State, 604 So.2d 1107, 1109 (Fla. 1992).
HAC focuses on the means and manner in which the death is inflicted and the immediate circumstances surrounding the death, rather than the intent and motivation of a defendant, where a victim experiences the torturous anxiety and fear of impending death. Thus, if a victim is killed in a torturous manner, a defendant need not have the intent or desire to inflict torture, because the very torturous manner of the victim's death is evidence of a defendant's indifference.
Barnhill v. State, 834 So.2d 836, 849-50 (Fla.2002) (citation omitted).[9] HAC does not apply to execution-style murders where "instantaneous or near instantaneous deaths by gunshot ... are unaccompanied by any additional acts by the defendant to mentally or physically torture *105 the victims." Rimmer v. State, 825 So.2d 304, 327 (Fla.2002) (emphasis added). As we explain below, the application of the HAC aggravator here meets both the "conscienceless or pitiless" prong and the "unnecessarily tortuous" prong.
Victorino was sentenced to death for the murders of four of the six victims: Erin Belanger, Francisco Ayo-Roman, Roberto Gonzalez, and Jonathan Gleason. As the trial court found, the attack was planned to take advantage of the quiet, early morning hours when there was little activity in the Telford Lane residence and the six victims were located in various rooms in the small house. Victorino kicked in the front door with such force that he overcame the locked deadbolt and damaged the doorframe. This noisy entry, which undoubtedly could be heard by all occupants of the small house, was far from stealthy. Wielding bats, the four defendants barged into the living room and immediately encountered Gleason, who began to argue and plead for his life, while another victim, Vega, fled the room. As the four codefendants dispersed to the various rooms in the small house in a methodical search for their victims, they began swinging their bats. The people in the housedefendants and victimsbegan yelling and screaming. In this assault, the defendants wreaked havoc in the house, as evidenced by the upended furniture, broken furnishings, and the blood of the six victims splattered on floors, walls, and ceilings throughout the house. As victims were found, one or more of the codefendants beat them to death with the bats. When one of the codefendants entered his bedroom, Gonzalez fought back, striking his assailant with a stick. Nathan vainly sought refuge by hiding in her bedroom closet. Victorino went to Belanger's bedroom and killed Ayo-Roman and Belanger, along with her dachshund.
Victorino's contention that the murders lacked any element of mental or physical torture is belied by this evidence. The medical examiner testified that all of the victims had contusions and bruises that were incurred while they were alive and which indicated their efforts to fend off the fierce blows from the bats. All died from extensive head fractures resulting from multiple, severe, blunt-force blows from a baseball bat. The evidence clearly supports the trial court's finding that "all of the victims were alive and aware of the attack as they were systematically killed" and the conclusion that "[w]ith the force exerted and the swinging of bats the victims, as long as they were conscious were going through a living hell." These victims were acutely aware of their impending deaths, and the murders were both conscienceless or pitiless and unnecessarily torturous. Accordingly, we hold that the trial court did not err in applying the HAC aggravating factor.

B. CCP
Victorino next argues that the CCP aggravator is unconstitutionally vague and that its application in this case is not supported by the evidence. These claims fail.
We reject Appellant's constitutional challenge as we have previously rejected this claim. See Jackson v. State, 648 So.2d 85, 90 (Fla.1994) (holding jury instruction on CCP aggravator unconstitutionally vague, but upholding constitutionality of the statutory aggravator against vagueness challenge); see also Phillips v. State, 705 So.2d 1320, 1323 (Fla.1997); Fotopoulos v. State, 608 So.2d 784, 794 (Fla.1992).
With regard to Appellant's second claim, we have enunciated a four-part test for the application of the CCP aggravator:
(1) the killing must have been the product of cool and calm reflection and not *106 an act prompted by emotional frenzy, panic, or a fit of rage (cold); and (2) the defendant must have had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and (3) the defendant must have exhibited heightened premeditation (premeditated); and (4) there must have been no pretense of moral or legal justification.
Lynch v. State, 841 So.2d 362, 371 (Fla. 2003).
The evidence and testimony at trial showed, as the trial court found, that Victorino and the three codefendants met at his house the morning before the murders. Victorino outlined a plan to recover his property from Belanger's Telford Lane residence and to kill everyone in the house by beating each person to death; he directed that there would be no witnesses left alive. Graham described Victorino as "calm, cool-headed." During the day, they further discussed the plan and tried, albeit unsuccessfully, both to obtain ammunition for the gun Victorino had and to steal a car to drive to the crime scene that night. In the darkness outside the residence, Victorino handed each person a batkeeping one for himselfand then walked around the house to determine the victims' locations. After Victorino directed where each defendant should go once inside, Victorino kicked in the door. Then, Victorino and the other defendants went inside and beat six people to death. Accordingly, we hold that competent, substantial evidence presented in this case clearly supports the trial court's finding that these murders were cold, calculated and premeditated.

C. Mental Mitigation
Victorino claims he was under an extreme mental or emotional disturbance at the time of the crime and that the trial court erred by refusing to consider and failing to find this statutory mental health mitigator. See § 921.141(6)(b), Fla. Stat. (2003). This argument is without merit.
First, the trial court expressly considered Appellant's claim. In fact, the trial court accepted the mental health evaluations of Victorino's experts, finding that Victorino had a mental disease or defect. And on that basis, the court found nonstatutory mitigation. The court, however, found no nexus between the mental defect and the crime. Appellant's experts agreed that Victorino could distinguish right from wrong and was capable of both planning and executing the crimes. None testified that he acted out of frenzy, panic, or rage. Further, the evidence conclusively showed that Victorino calmly planned the murders, methodically executed the plan, and then tried to dispose of evidence linking him to it. Thus, no evidence supports Victorino's claim that he was under an extreme mental or emotional disturbance at the time of the crime. See Coday v. State, 946 So.2d 988, 1003 (Fla.2007) ("[A] trial court may reject a proposed mitigator if the mitigator is not proven or if there is competent, substantial evidence to support its rejection."). Accordingly, we affirm the court's rejection of this statutory mitigating factor.

D. Disparate Sentences and Proportionality
Victorino contends that four death sentences are disproportionate to the sentences of his codefendants. In this case, codefendant Hunter also received four death sentences, but Salas and Cannon were sentenced to life for all six murders. We have previously "found disparate treatment permissible in situations where the defendant is more culpable than the codefendant who has received a life sentence." Gonzalez v. State, 990 So.2d 1017, 1032 (Fla.2008).
Contrary to Victorino's conclusory claim, there is ample evidence that he was *107 more culpable than Salas and Cannon. As we have already explained in detail, Victorino was the ringleader who recruited the others, planned the brutal means and systematic method for the murders, and led the execution of his scheme. Furthermore, Cannon was sentenced to life sentences pursuant to a plea agreement, and this Court generally rejects claims of disparate sentencing when the codefendant's sentence resulted from his entry of a plea or prosecutorial discretion. See England v. State, 940 So.2d 389, 406 (Fla.2006) (citing cases).[10]
Victorino does not specifically argue that his sentence is disproportionate compared to other death sentences in Florida, but it is this Court's duty to conduct a "proportionality review to prevent the imposition of `unusual' punishments contrary to article I, section 17 of the Florida Constitution." Simmons v. State, 934 So.2d 1100, 1122 (Fla.2006); see also Fla. R.App. P. 9.142(a)(6). We conduct a qualitative review of the totality of the circumstances of the case and compare the case with other capital cases. In this case, the trial court imposed death sentences for four of the six murders. The trial court found five aggravators applicable to all four murders, ascribing them moderate to great weight: (1) that Victorino had a prior violent felony conviction and was under sentence of imprisonment (moderate weight); (2) that he had prior capital felony convictions based on the contemporary murder convictions (very substantial weight); (3) that the murders were committed in the course of a burglary (moderate weight); (4) that the murders were HAC (very substantial weight); and (5) that the murders were CCP (great weight). The trial court found and accorded substantial weight to a sixth aggravator applicable to the murders of Gonzalez and Gleasonthat the murders were committed to avoid arrest. The trial court, however, found no statutory mitigators, and ascribed moderate to very little weight to nine nonstatutory mitigators.
We conclude that under the totality of the circumstances and in comparison with analogous cases in which this Court ruled that death was a proportionate penalty, the sentences here are proportionate. See, e.g., Reynolds v. State, 934 So.2d 1128, 1138 (Fla.2006) (finding two death sentences proportionate where trial court found minimal mitigation and four statutory aggravators for one death sentence and five for the other, including HAC, prior capital felony conviction, committed in the course of a burglary, and to avoid arrest; with no statutory mitigators and four nonstatutory mitigators); Lugo v. State, 845 So.2d 74, 91-92 (Fla.2003) (affirming two death sentences where trial court found minimal mitigation and five aggravating factors, including prior violent felonies, CCP, in course of a burglary, to avoid arrest, for pecuniary gain, and HAC); Rolling v. State, 695 So.2d 278, 283, 297 (Fla.1997) (holding five death sentences proportionate where trial court found two statutory mitigators and some nonstatutory mitigators, but found four statutory aggravators applied to each of the five convictions, including previous violent felony convictions, CCP, HAC, and committed in course of burglary).

E. Ring Claim
Victorino argues that Florida's death penalty scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We disagree. Ring does not apply to cases that include the prior violent felony aggravator, *108 the prior capital felony aggravator, or the under-sentence-of-imprisonment aggravator, and Victorino's case includes all three. See Floyd v. State, 913 So.2d 564, 577-78 (Fla.2005). We have previously rejected challenges to Florida's death penalty scheme under Ring. See Reynolds v. State, 934 So.2d 1128, 1160 (Fla.2006). Accordingly, Victorino is not entitled to relief on this claim.

F. Cumulative Error
Victorino claims that the cumulative effect of the errors requires that he receive a new trial. However, because Victorino's individual claims are without merit, his cumulative error claim must fail. See Griffin v. State, 866 So.2d 1, 22 (Fla.2003) ("[W]here individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error must fail."). Accordingly, Victorino is not entitled to relief on this claim.

IV. CONCLUSION
In accord with the above analysis, we affirm Victorino's convictions and sentences.
It is so ordered.
QUINCE, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, and LABARGA, JJ., concur.
PARIENTE, J., specially concurs with an opinion.
PERRY, J., did not participate.
PARIENTE, J., specially concurring.
I concur in the majority's affirmance of the convictions and sentences; however, I write to express my view that the admissibility of the evidence of the planned fight at the park and the subsequent discharge of the gun was questionable. I start with this essential proposition: Extreme caution must be exercised before allowing collateral crime evidence to be heard by the jury because of the obvious tendency for a jury to believe that a person who committed other criminal acts is more likely to have committed the crime in question. See Robertson v. State, 829 So.2d 901, 913-14 (Fla.2002) ("[T]he erroneous admission of irrelevant collateral crimes evidence `is presumed harmful error because of the danger that a jury will take the bad character or propensity to crime thus demonstrated as evidence of guilt of the crime charged.'" (quoting Castro v. State, 547 So.2d 111, 115 (Fla.1989))). As I have previously stated:
[T]he danger of collateral crime evidence is that the jury will convict the defendant based on prior crimes because these unrelated crimes would "go far to convince [individuals] of ordinary intelligence that the defendant was probably guilty of the crime charged. But, the criminal law departs from the standard of the ordinary in that it requires proof of a particular crime."
Smith v. State, 866 So.2d 51, 71 (Fla.2004) (Pariente, J., concurring in part and dissenting in part) (second alteration in original) (quoting Jackson v. State, 451 So.2d 458, 461 (Fla.1984)). So although the general test for admissibility of all evidence is "relevancy," we have always recognized the potential for injustice if collateral crime evidence is placed before the jury. See Hodges v. State, 885 So.2d 338, 358 (Fla.2004) ("Regardless of relevancy of collateral crime evidence ... admissibility is improper where the probative value of the evidence is substantially outweighed by undue prejudice.").
Whether the evidence is similar or dissimilar fact evidence, the same risk of danger exists that the jury will convict the defendant not based on the crime charged but because it hears that the defendant *109 has committed a series of bad acts. Therefore, in addition to analyzing whether the evidence is relevant, there must also be a careful analysis by the trial court and then this Court as to whether the prejudice from this collateral crime evidence substantially outweighs any probative value. See § 90.403, Fla. Stat. (2004).
In this case, as the majority correctly points out, the collateral crime evidence was not similar fact evidence. The majority cites to Griffin v. State, 639 So.2d 966 (Fla.1994), for the standard of relevancy for admitting dissimilar fact evidence. Griffin explains the test for dissimilar fact evidence as follows:
[E]vidence of uncharged crimes which are inseparable from the crime charged, or evidence which is inextricably intertwined with the crime charged, is not Williams rule evidence. It is admissible under section 90.402 because "it is a relevant and inseparable part of the act which is in issue.... [I]t is necessary to admit the evidence to adequately describe the deed." Charles W. Ehrhardt, Florida Evidence § 404.17 (1993 ed.)....
Griffin, 639 So.2d at 968. Therefore, as I read Griffin, evidence of dissimilar uncharged crimes must be either "inseparable from the crime charged" or "inextricably intertwined" with the crime charged. The evidence becomes admissible because "it is a relevant and inseparable part of the act which is in issue" or it is "necessary to admit the evidence to adequately describe the deed."
Trial courts must be always cautious to not allow dissimilar crime evidence simply because the other bad acts took place in close proximity to the crime. The more tenuous the link between the collateral act and the crime, the less "necessary" the collateral act evidence is to "adequately describe" the crime. In my view, the fact that there was no gun used during the murders makes the admissibility of the fact that Victorino fired a gun at a group while engaged in a car chase questionable. Further, a critical step in determining admissibility of prior bad acts is the careful analysis of prejudice.
However, I ultimately agree with the majority to affirm on this issue because I conclude in this case that any error in admitting evidence of the park fight and discharge of a firearm is harmless beyond a reasonable doubt in this case. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla. 1986). Here, the trial court gave a limiting instruction to the jury on the collateral acts evidence. Furthermore, while a review of the record reveals that the State did mention and rely on the evidence of the planned park fight and gunshot, these references were negligible when compared to the entirety of the State's presentation, including the other evidence of the events leading up to the crime, the extensive and shocking evidence of the crime itself, and the substantial testimony of the defendant's involvement as the ringleader in that crime. In light of the trial court's instruction and the State's limited use of this evidence, I conclude that any error in its admission did not contribute to the jury's verdict. See Floyd v. State, 913 So.2d 564, 573-74 (Fla.2005) (holding that the erroneous admission of dissimilar fact evidence was harmless as it was strictly limited by the trial court and was only briefly referenced by the State). Accordingly, I concur in the majority's affirmance of the convictions and sentences of death.
NOTES
[1] Codefendants Hunter and Salas were convicted of six first-degree murders. Hunter received four death sentences and two life sentences; Salas received life sentences. We have affirmed Hunter's convictions and sentences. Hunter v. State, 8 So.3d 1052 (Fla.), cert. denied, ___ U.S. ___, 129 S.Ct. 2005, 173 L.Ed.2d 1101 (2008). The Fifth District has also affirmed Salas's convictions and sentences. Salas v. State, 972 So.2d 941 (Fla. 5th DCA 2007).
[2] Spencer v. State, 615 So.2d 688 (Fla.1993).
[3] The court also sentenced Victorino as a habitual offender to the following terms to be served consecutively: (1) ten years for Count I, conspiracy (to commit aggravated battery, murder, armed burglary, and tampering with evidence); (2) two life sentences for Counts VI and VII, the murders of Michelle Nathan and Anthony Vega; (3) thirty years for Count VIII, the abuse of a dead human body with a weapon (Belanger); (4) life for Count XIII, the armed burglary of a dwelling; and (5) ten years for Count XIV, cruelty to an animal.
[4] Victorino renewed his objection at trial when a forensic crime scene analyst testified that Victorino's DNA matched the dominant DNA profile of the wearer of the Lugz boots.
[5] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[6] Even if Victorino had raised the argument that the warrant lacked sufficient particularity, we would deem it without merit as we did in Hunter. 8 So.3d at 1064-65.
[7] We have previously described a Bruton claim:

In Bruton, the United States Supreme Court held that a defendant's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution were violated by the introduction of a non-testifying codefendant's confession which named and incriminated the defendant at a joint criminal trial. The crux of a Bruton violation is the introduction of statements which incriminate an accused without affording him an opportunity to cross-examine the declarant.
Looney v. State, 803 So.2d 656, 671 (Fla.2001) (citation omitted).
[8] Our conclusion that the evidence at issue was not similar fact evidence subject to section 90.404(2) renders moot Victorino's arguments that the State failed to comply with the ten-day notice requirement pursuant to section 90.404(2)(c)(1) and that the trial court erroneously introduced this evidence pursuant to section 90.404(2)(a).
[9] In State v. Dixon, 283 So.2d 1, 9 (Fla.1973), we explained the HAC aggravator as follows:

It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital feloniesthe conscienceless or pitiless crime which is unnecessarily torturous to the victim.
[10] We previously held that Hunter's sentence was not disproportionate in relation to the sentences of Salas and Cannon. Hunter, 8 So.3d at 1074.