DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**JOSHUA NATHANIEL PEART,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D21-3582

[March 15, 2023]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Scott Suskauer, Judge; L.T. Case No. 502019CF009838B.

Carey Haughwout, Public Defender, and Claire Victoria Madill, Assistant Public Defender, West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Heidi L. Bettendorf, Senior Assistant Attorney General, West Palm Beach, for appellee.

GERBER, J.

We affirm the defendant's convictions and sentences for first-degree murder with a firearm of one victim, and the lesser included offense of attempted second-degree murder with a firearm of a second victim.

We write to address only the defendant's argument that the state presented insufficient evidence to support the trial court's reading of the "Principals" instruction to the jury. Although we agree with the defendant's argument, we conclude the defendant's trial counsel did not timely object to the "Principals" instruction, and therefore did not preserve that objection for appeal. We further conclude the trial court's reading of the "Principals" instruction to the jury did not rise to the level of fundamental error, because the state could have obtained the guilty verdicts against the defendant without the alleged error's assistance. Thus, we affirm the defendant's convictions and sentences.

We present this opinion in five sections:
1. The state's trial evidence;
2. The parties' closing arguments to the jury;

3. The parties' trial arguments on the "Principals" instruction;
4. The parties' appellate arguments on the "Principals" instruction; and
5. Our review.

## 1. *The State's Trial Evidence*

The state charged the defendant and a co-defendant with first-degree murder with a firearm of one victim, and attempted first-degree murder with a firearm of a second victim. The trial court severed the defendant's and the co-defendant's cases for trial.

At the defendant's trial, the state's evidence established the following chain of events, all of which occurred in the neighborhood where the defendant, the co-defendant, and the victims lived.

On October 18, 2019, at around 11:45 a.m., the co-defendant's mother, while walking down the street, saw the first victim standing near a market. The co-defendant's mother asked the first victim to pay back money which she had lent him. The first victim responded he was not going to pay her back, called her a name, threw a can at her, pulled a gun, and said he was "always ready."

The co-defendant's mother immediately called the co-defendant. The co-defendant then called a friend, who was with the defendant at a girlfriend's home. The co-defendant asked to speak with the defendant. The friend handed the phone to the defendant. The friend could not hear the conversation between the co-defendant and the defendant. When the defendant finished the conversation, he said he had to go, and handed the phone back to the friend. The defendant and the friend left the girlfriend's home. They met up with a fourth man in the street.

The co-defendant then drove up in his mother's car. The co-defendant was by himself. The defendant got into the front passenger seat. The fourth man got into the back seat on the passenger's side. The friend asked the co-defendant for a ride home. The co-defendant said yes. The friend got into the back seat on the driver's side. Up to that point, the friend had not seen any of the other three men possessing a firearm.

When the friend got in the car, he put on his headphones and turned on some music on his phone. However, when the co-defendant began explaining what had happened to his mother, the friend briefly took off his headphones. Although the friend had missed the first part of the conversation, the friend heard the co-defendant say someone had pulled a gun on his mother. Everyone in the car knew the co-defendant's mother,

2

so they all became upset. The friend put his headphones back on, looked down at his phone, and did not pay attention to which direction the co-defendant was driving.

Less than fifteen minutes later, while still looking down at his phone, the friend was startled after hearing loud shots being fired from the front passenger seat. Without looking up, the friend immediately crouched down in the back seat to brace himself and avoid getting hurt. From his crouched position, the friend could see that the fourth man who was in the back seat with him was not holding a firearm. However, the friend could not see the co-defendant and the defendant in the front seats.

After the car continued on and things went silent, the friend looked up from the back seat. He noticed that the co-defendant had not driven in the direction of the friend's home. The friend got upset because of what had just occurred and said he wanted to go home. The co-defendant instead drove back to the defendant's girlfriend's house. The co-defendant parked the car in the driveway. The friend got out of the car and began speaking to the co-defendant's aunt, who happened to be at the house too. Meanwhile, the friend saw the co-defendant and the defendant walking back and forth, to and from the car. Because the friend was focused on his conversation with the co-defendant's aunt, he did not notice whether the co-defendant or the defendant had removed anything from the car.

The police investigated the shooting, which had taken place just before noon outside the market where the co-defendant's mother had been in the confrontation with the first victim fifteen minutes earlier. The police obtained videos from the market's exterior security cameras. As will be discussed more fully below, the videos showed someone in the co-defendant's mother's car firing shots out of the open front passenger seat window at the first victim. The first victim was shot and ran inside the market, where he died of his wounds. The police also learned that a stray bullet had gone into the market and struck a glass bottle, which shattered and injured the second victim who had been standing at the market's checkout counter.

The police never found the firearm which had fired the shots. However, the police found five spent bullet shell casings. Four casings were found outside the market. The fifth casing was found in the co-defendant's mother's car on the back floor near the passenger side door. A crime scene investigator determined that the casings were 5.56 millimeters long. The investigator elaborated on what the casings revealed about the bullets and firearm type used:

3

It's a large, long looking bullet. It has a lot of gunpowder in it. The bullet, the projectile that comes out of it is very small, it's like when you hear a 22 rifle that kids shoot ... for squirrel hunting, it's that same caliber. It's a little heavier range which is a little bit heavier bullet, a little bit longer bullet, but the caliber is the same. It's the charge in the round that is large.

The police identified the defendant's fingerprint on the car's front passenger side inside door handle. However, the police were unable to collect any fingerprints or DNA on the spent bullet casings.

At trial, the friend testified on direct examination that he had not seen any part of the firearm which had fired the shots. However, on cross-examination, defense counsel impeached the friend through his deposition testimony on this topic. During the deposition, the friend testified that the firearm which had fired the shots was a rifle, the length of which he described as "almost from [his] fingers to [his] shoulder." On redirect examination, the friend testified that he got only a glimpse of the firearm, and assumed the firearm was a rifle because of how loud the shots were.

As mentioned above, the market had exterior security cameras. The state introduced into evidence the cameras' videos and seven still photos derived from those videos. The seven still photos (re-labeled A.-G. below) show the co-defendant's mother's red car driving past the market's side, and then turning the corner to drive past the market's front, when the shots were fired from the red car's open front passenger window at the first victim, who was next to the market's door wearing a red hat, white shirt, red shorts, and red shoes:



A.



B.

4



C.

D.

E.

F.

G.

The videos from which the above still photos were derived were only seconds long, as the red car had driven past the market very quickly.

From these videos and still photos, the investigating detective testified as follows. The red car's front passenger window appeared to be down. The firearm used in the shooting could be seen as the black image sticking out of the front passenger window. The following discussion then occurred between the state and the detective:

> STATE: [W]hat is being depicted here [in photo D.]?
>
> DETECTIVE: **[Y]ou can see the front passenger is the shooter in the incident**, and you can see he extends his firearm towards the store front where the victim was last seen running into.
>
> STATE: Okay. And again **this is all things that the jury can see on the surveillance video**; these are just still shots?
>
> DETECTIVE: Correct.

(emphases added). Defense counsel did not object to the detective having testified to his personal observation from the videos and still photos that "the front passenger is the shooter in the incident," despite the state having acknowledged that the jury could view the videos for themselves.

## 2. *The Parties' Closing Arguments to the Jury*

The state had provided its proposed jury instructions to defense counsel two days before closing arguments were expected to occur. On the day when closing arguments were expected to occur, and just before the state was to begin presenting its remaining witnesses, the following discussion occurred:

> THE COURT (speaking to defense counsel): … [M]aybe later on this morning or early this afternoon, you … can let me know if there are any objections to the instructions that were sent over from [the state].
>
> DEFENSE COUNSEL: Yes, Judge. I think I went over [the instructions] with [the state] before and **I think [the instructions] were in order but I'll just double-check**.

(emphases added).

6

However, defense counsel—at no point before closing arguments—objected to any of the state's proposed jury instructions, including a proposed standard instruction on "Principals."

During the state's initial closing argument, the state began by telling the jury that one of the instructions which the trial court would be presenting after closing arguments would be the "Principals" instruction. The state quoted the "Principals" instruction for the jury, and then provided the state's explanation of how the "Principals" instruction applied to the evidence:

> Princip[als] [means] that ["i]f [the] defendant helped another person or persons commit a crime, the defendant is a principal and must be treated as if he did all the things that the other person did.["] ...
>
> ....
>
> ... So, in order to be a princip[al] of a crime, meaning that you and someone else are together causing this crime to occur, there has to be two things present: ["]That the defendant had a conscious intent that the criminal act be done; and ... the defendant did some act or said some word which was intended to incite, cause, encourage, assist or otherwise advise a person or persons to actually commit the crime." **So, here, it's that [the co-defendant] did something, told [the defendant] something that made [the defendant] do this.**

(emphases added). Defense counsel did not contemporaneously object to the state's explanation of how the "Principals" instruction applied to the evidence.

Next, while attempting to prove the element that the defendant's criminal act caused the first victim's death, the state sought to convince the jury that the videos and still photos, along with other evidence, proved the defendant was the shooter:

> [T]his is the [element] that is a little bit more contested. That is, is the front seat passenger of this vehicle that we see shooting in that surveillance video [the defendant].
>
> Now, no one is trying to pull any wool over anybody['s] eyes. Obviously that surveillance video is not the clearest. It's not

7

like you can look at it and you're like, bam, that's [the defendant], right? You needed additional information to get you to that point, and that's where the scientific evidence is coming in, the testimony of the witnesses, as well as the physical evidence in the case.

... Well, we know that at the time of the comparisons for the latent prints [on the car's front passenger inside door handle] that [the police] ... [were] able to determine that ... the latent print[] was in fact this defendant.

Then you also obviously heard from [the friend who was] ... sitting behind the driver in the back seat. [The friend] told you ... he knew [the shots were] coming from the front passenger side of that vehicle.

But in case [you] didn't believe that, we have the surveillance video. ... [W]e also for you created some still shots from [the video] which is just pictures of what's happening as the surveillance video is playing. And you can see on there if you watch it, that muzzle coming out, the fire from the muzzle coming out ....

During the defense's closing, defense counsel argued that given the evidence indicating a rifle was the type of firearm used in the shooting, and that only a small portion of the rifle was protruding from the front passenger window, the evidence indicated that the shooter was the co-defendant, who had fired the rifle while sitting in the driver's seat:

[W]e both are going to use the same pictures and the State just told you how these pictures show what [the State] wants you to believe, [the defendant] firing a rifle out of the ... front passenger's seat ... and you see the front passenger seat and you can barely see this little teeny nib of a weapon, of a rifle. We know it's a rifle because there's casings that crime scene says it came from a rifle. And ... [in the photos] you're going to see this little teeny nib right over the [outside] door handle. How is this a long rifle that's being held by the front passenger's occupant? If [the front passenger's occupant is] sitting in the seat by the window and whoever's holding this gun, if they're sitting in the front passenger seat, you're going to see the gun. It's outrageous.

....

At best, what [the friend testified to] was ["]I don't know who shot that gun.  I don't know if it was the driver who was holding the gun, I didn't see his hands.  I don't know if it was the front passenger who was holding the gun, I didn't see his hands.["] That's the best [which the State] gave you ….

Defense counsel's closing argument did not include any response to the state's explanation of how the "Principals" instruction applied to the evidence.

The state's rebuttal closing argument challenged defense counsel's argument that the co-defendant had been the shooter:

> Defense [counsel] would have you … believe that this was someone else in the car that fired the gun?  Well, we know that [the co-defendant] is driving … so he certainly could not have been the shooter.  But to believe Defense[] [counsel's] theory means that whoever was in the front [passenger] seat allowed someone to shoot a high powered gun past the front of their face.  That is ridiculous.  ….

### 3. *The Parties' Trial Arguments on the "Principals" Instruction*

*After* closing arguments, but before the trial court read the instructions to the jury, defense counsel first objected to the "Principals" instruction:

> DEFENSE COUNSEL:  Judge, I do want to object to the [P]rincip[als] instruction.  I told that to [the State] last weekend that I didn't think [the Principals instruction] was appropriate, and [the Principals instruction] just came out [during the State's closing argument,] but there's nothing in this case[.]  [T]he State] is trying to say [the defendant] is the shooter, not a principal in this case at all, so we would object to the [P]rincip[als] instruction.
>
> ….
>
> … I [don't] feel the [Princip[als] instruction [is] appropriate for a defendant who [the State is] alleging is the sole shooter in this case, that he did not work with somebody, and there's no evidence that he planned anything and helped someone else commit a crime.
>
> THE COURT:  Okay.  [State?]

9

STATE: … [T]he primary response is two-fold. Obviously the State's theory of the case is that two individuals planned and one person executed this crime, that being [the defendant]. From the beginning [and] up to this point, the [co-defendant] has come up multiple times as the person who was primarily in contact with the reason for the motive, that being his mother and the [first] victim having that argument prior to the shooting. Without that, this doesn't make sense because [the defendant], as the evidence has shown, doesn't have an involvement with the [first] victim. So, the [P]rincipal[s] instruction is very much important, not only to the State's case, but generally to make sense of this crime now that the jury has it in their hands, to understand how that operates.

THE COURT: Okay, [defense counsel], I deny your request to exclude [the Principals] instruction.

The trial court proceeded to read the instructions to the jury, including Standard Criminal Jury Instruction 3.5(a) on "Principals":

### 3.5(a) PRINCIPALS
### F.S. 777.011

If the defendant helped another person or persons commit or attempt to commit a crime, the defendant is a principal and must be treated as if he had done all the things the other person or persons did if

1. the defendant had a conscious intent that the criminal act be done and

2. the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise the other person or persons to actually commit or attempt to commit the crime.

Fla. Std. Jury Instr. (Crim.) 3.5(a) (2019).

After the trial court completed the jury instructions, defense counsel renewed his objection to the trial court having read the "Principals" instruction to the jury.

10

The jury then conducted its deliberations, during which it requested to review the market's exterior security camera videos which the state had introduced into evidence and shown the jury during the trial.

After completing its deliberations, the jury issued its verdicts finding the defendant guilty of first-degree murder with a firearm of the first victim, and guilty of the lesser included offense of attempted second-degree murder with a firearm of the second victim.  After each of the two guilty verdicts, the jury answered "Yes" to the following three questions:

1. During the commission of this offense, did the Defendant **actually possess** a firearm?
    √  Yes   ___ No

2. During the commission of this offense, did the Defendant **discharge** a firearm?
    √  Yes   ___ No

3. During the commission of this offense, did the Defendant discharge a firearm, **which discharge caused the death or serious bodily injury to** [the first victim/the second victim]?
    √  Yes   ___ No

(emphases added).

Post-trial, the defendant filed a Florida Rule of Criminal Procedure 3.610 motion to arrest judgment, arguing various grounds, including that the state improperly used the "Principals" instruction to obtain the guilty verdicts.  The trial court denied that motion.

The trial court sentenced the defendant on the two convictions to concurrent sentences of life in prison.

### 4. *The Parties' Appellate Arguments on the "Principals" Instruction*

This appeal followed.  Regarding the "Principals" instruction, the defendant argues as follows:

> The trial court erred in overruling [the defendant's] objection to the principal liability instruction.  The state proceeded throughout trial on the theory that [the defendant] was the actual shooter but, in probable recognition of the weakness of their case, the state suddenly switched to a

principal theory in closing, arguing that [the co-defendant] possibly committed the shooting and [the defendant] somehow helped. But there was absolutely zero evidence to support a principal liability theory. There was no evidence that [the defendant] intended or assisted [the co-defendant] in shooting [the first victim]. While [the co-defendant] apparently told [the defendant], [the friend], and [the fourth man] about [the first victim] disrespecting [the co-defendant's] mother, there was no evidence that [the co-defendant] asked [the defendant] or any of the other young men to help him find and shoot [the first victim]. [The defendant's] mere presence or mere knowledge of [the co-defendant's] intent, to the extent [the defendant] even knew, was not enough.

The state's answer brief responds both procedurally and substantively. Procedurally, the state argues that because the defendant's trial counsel did not object to the reading of the "Principals" instruction until *after* closing arguments—and thus *after* the state had provided its unobjected-to explanation of how the "Principals" instruction applied to the evidence—the defendant's trial counsel did not raise a contemporaneous objection, and therefore did not preserve the issue for appellate review:

> Defense counsel initially stated he had no objection to the jury instructions. Defense counsel engaged in a classic "gotcha" maneuver when he raised this issue after the State presented its closing argument. [The defendant] now essentially claims a defendant may sit idly by during his trial, fail to raise an appropriate objection to the State's purportedly improper pursuit of multiple theories of guilt, and then interpose an objection after the State has already presented its closing argument.

Substantively, the state argues that although it presented sufficient evidence to prove the defendant was the shooter, it also presented sufficient evidence to prove the defendant was a principal to the crimes if the co-defendant was the shooter. According to the state:

> [A defendant] is a principal in the first degree whether he actually commits the crime or merely aids and abets, and it is immaterial whether the indictment or information alleges one or the other in particular so long as the proof established he is guilty of one or the other. ...
>
> ....

12

Here, the evidence showed [the defendant] was in the [co-defendant's mother's car] at the time of the shooting and was involved in the shooting, regardless of whether he was the actual shooter. [The friend] testified [the defendant] and [the co-defendant] were discussing how the victim treated [the co-defendant's] mother and that the [first] victim would be [at the market]. The jury could have believed that [the defendant] aided and abetted [the co-defendant] when [the defendant] helped clean up the interior of the [co-defendant's mother's car] after the shooting. [The friend] testified that immediately after the shooting, he saw [the defendant] and [the co-defendant] going back and forth from the car. Thus, regardless of whether [the defendant] was the actual shooter, the State's evidence showed at a minimum [that the defendant] was one of the principals during the shooting.

The defendant has not filed a reply brief. Thus, the defendant has not sought to rebut the state's procedural argument that the defendant's trial counsel did not timely object to the "Principals" instruction in order to preserve the objection for appeal.

### 5. *Our Review*

*a. The defendant's trial counsel did not timely object to the "Principals" instruction in order to preserve the objection for appeal.*

We agree with the state's argument that because the defendant's trial counsel did not object to the reading of the "Principals" instruction until *after* closing arguments—and thus *after* the state had provided its unobjected-to explanation of how the "Principals" instruction applied to the evidence—the defendant's trial counsel did not raise a contemporaneous objection, and therefore did not preserve the issue for appellate review.

"Generally, a defendant must raise a contemporaneous objection to the jury instructions to preserve an issue for appellate review." *Richards v. State,* 39 So. 3d 431, 433 (Fla. 2d DCA 2010). "The requirement of a contemporaneous objection is based on practical necessity and basic fairness in the operation of a judicial system. [A contemporaneous objection] places the trial judge on notice that error may have been committed, and provides [the trial judge] an opportunity to correct [any error] at an early stage of the proceedings." *State v. Garcia,* 346 So. 3d 581, 585 (Fla. 2022) (citation omitted).

13

Here, when the trial court, during the state's case-in-chief, first asked defense counsel if he had any objections to the state's proposed jury instructions, defense counsel responded: "I think I went over [the instructions] with [the state] before and *I think [the instructions] were in order but I'll just double-check.*" (emphasis added). However, defense counsel—at no point before closing arguments—objected to any of the state's proposed jury instructions, including the proposed standard instruction on "Principals." Later, during the state's initial closing argument, when the state quoted the "Principals" instruction for the jury, and provided the state's explanation of how the "Principals" instruction applied to the evidence, defense counsel still did not object. Only *after* closing arguments, but before the trial court read the instructions to the jury, did defense counsel finally object to the "Principals" instruction. That objection was not contemporaneous. Pursuant to *Garcia*, we conclude the defendant's trial counsel did not preserve the objection for appeal.

Because the defendant's trial counsel did not preserve the objection for appeal, the defendant must show in this appeal not only that the state presented insufficient evidence to support the trial court's reading of the "Principals" instruction to the jury, but also that the error was fundamental, i.e., the state could not have obtained the guilty verdicts against the defendant without the alleged error's assistance. *See, e.g.*, *Victorino v. State*, 23 So. 3d 87, 101 (Fla. 2009) ("Fundamental error in a jury instruction requires that the error reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.") (citation and internal quotation marks omitted). We will address each required showing in turn.

*b. The state presented insufficient evidence to support the trial court's reading of the "Principals" instruction to the jury.*

We agree with the defendant that the state presented insufficient evidence to support the trial court's reading of the "Principals" instruction to the jury.

"The standard of review governing a trial court's decision to give a standard jury instruction is abuse of discretion. Discretion is abused only where no reasonable [person] would take the view adopted by the trial court." *Radler v. State*, 290 So. 3d 87, 90 (Fla. 4th DCA 2020) (internal brackets and citations omitted). However, "that discretion, as with any issue of law[,] is strictly limited by case law." *Ramirez Ramos v. State*, 274 So. 3d 395, 397 (Fla. 4th DCA 2019).

14

Case law provides that "[g]iving the ['P]rincipals['] instruction is error when there is no evidence that the defendant had a conscious intent that the crime be committed and did some act or said some word which was intended to and in fact did incite a third party to commit the crime with which the defendant is charged." *Hanks v. State*, 43 So. 3d 917, 918 (Fla. 2d DCA 2010) (citation omitted). "Mere presence at the scene of an offense is not sufficient to support a ['P]rincipals['] instruction." *Id.* (citation omitted). *See also Rocker v. State*, 122 So. 3d 898, 902 (Fla. 2d DCA 2013) (the defendant's mere presence at the scene, knowledge of the offense, and flight from the scene were insufficient to support his conviction as a principal for another person's conduct); *Davila v. State*, 988 So. 2d 35, 38 (Fla. 2d DCA 2008) (the state presented insufficient evidence for principal liability where "the only evidence connecting [the defendant] to the criminal activities was his knowledge that the others wanted to commit a robbery and his presence in the vehicle when the robbery and murder were committed").

Here, to the extent the state's answer brief has pointed to three pieces of evidence which the state now argues supported the trial court's reading of the "Principals" instruction to the jury, we conclude those three arguments lack merit.

First, the state argues the evidence was sufficient to support the "Principals" instruction because "the evidence showed [the defendant] was in the [co-defendant's mother's car] at the time of the shooting and was involved in the shooting, regardless of whether he was the actual shooter." The state is correct that the defendant was in the co-defendant's mother's car at the time of the shooting. However, the case law cited above indicates the defendant's alleged knowledge that the co-defendant wanted to shoot the first victim, and the defendant's presence in the car when the shooting was committed—if indeed the co-defendant was the shooter—would have been insufficient for principal liability. Further, if the co-defendant was the shooter, the state does not describe any evidence showing how the defendant was "involved in the shooting." The state also presented no evidence that the defendant incited the co-defendant to commit the shooting or gave a firearm to the co-defendant to commit the shooting.

Second, the state argues the evidence was sufficient to support the "Principals" instruction because "[the friend] testified [the defendant] and [the co-defendant] were discussing how the victim treated [the co-defendant's] mother and that the [first] victim would be [at the market]." Again, however, the state does not describe any action which the defendant may have taken to aid, abet, counsel, or otherwise procure the co-defendant to commit the shooting, if indeed the co-defendant was the

15

shooter. *See* § 777.011, Fla. Stat. (2019) ("Whoever commits any criminal offense against the state, whether felony or misdemeanor, *or aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree* and may be charged, convicted, and punished as such, whether he or she is or is not actually or constructively present at the commission of such offense.") (emphasis added).

Third, the state argues the evidence was sufficient to support the "Principals" instruction because "[t]he jury could have believed that [the defendant] aided and abetted [the co-defendant] when [the defendant] helped clean up the interior of the [co-defendant's mother's car] after the shooting. [The friend] testified that immediately after the shooting, he saw [the defendant] and [the co-defendant] going back and forth from the car." The state is correct that the friend testified he saw the defendant and the co-defendant going back and forth from the car immediately after the shooting. However, the friend did not testify, and the state presented no other evidence to show, that the defendant had helped to clean up the interior of the co-defendant's mother's car after the shooting.

Even if the state had presented evidence that the defendant had helped to clean up the car, such evidence, at best, would have shown the defendant would have been liable as an accessory after the fact, which is different from principal liability. *See* § 777.03(1)(c), Fla. Stat. (2019) ("Any person who maintains or assists the principal or an accessory before the fact, or gives the offender any other aid, knowing that the offender had committed a crime and such crime was a capital, life, first degree, or second degree felony, or had been an accessory thereto before the fact, with the intent that the offender avoids or escapes detection, arrest, trial, or punishment, is an accessory after the fact.").

> c. *The error in reading the "Principals" instruction to the jury was not fundamental, because the state could have obtained the guilty verdicts against the defendant without the alleged error's assistance.*

We conclude the error in reading the "Principals" instruction to the jury—based on the lack of evidence to support the instruction—was not fundamental, because the state could have obtained the guilty verdicts against the defendant without the alleged error's assistance. We have reached this conclusion for two reasons.

First, the state's central theory of the case was that the defendant was the shooter. The state presented sufficient evidence from which the jury

could have found beyond a reasonable doubt that the defendant was, in fact, the shooter.

According to the friend's testimony, after the co-defendant spoke by phone with the defendant, the defendant immediately said he had to go. When the co-defendant drove up in his mother's car, the defendant immediately got into the car's front passenger seat without being told to do so or asking to do so. When the co-defendant told the other men in the car that the first victim had pulled a gun on the co-defendant's mother, everyone in the car became upset. When the co-defendant drove the car around the corner to pass the market where the first victim was standing, the friend was startled by the loud shots which had come from the car's front passenger seat, where the defendant was sitting. And the market's exterior security cameras recorded the car as it turned the corner, drove past the market where the first victim was located, had someone fire shots from the open front passenger seat window, and then continued down the street. The car, with the co-defendant at the wheel, never stopped moving.

That evidence, considered together, could have led the jury to have found beyond a reasonable doubt that the defendant was the shooter, as reflected in the jury's verdict. The jury not only found the defendant guilty of first-degree murder with a firearm of the first victim and guilty of the lesser included offense of attempted second-degree murder with a firearm of the second victim, but more importantly, as part of those verdicts, the jury found that during the commission of these offenses, *the defendant* "actually possess[ed] a firearm" and "discharged a firearm" … "which discharge caused" the first victim's death and the second victim's serious bodily injury.

We recognize the defendant's trial counsel propounded a viable alternative theory that the co-defendant was the shooter. The defendant's trial counsel supported that theory with the friend's deposition testimony regarding the firearm's length, the crime scene investigator's testimony regarding the spent bullet casings' size, and the security videos showing only a small portion of the firearm's muzzle protruding from the car's open front passenger seat window. Defense counsel also argued the co-defendant had the strongest motive to seek revenge against the first victim for having pulled a gun on the co-defendant's mother. However, the jury had the opportunity to weigh the evidence and arguments upon which the defense relied, and nevertheless found the defendant was the shooter.

Second, although the state's answer brief has attempted to show how the defendant could have been a principal if the co-defendant had been the shooter, the state's trial counsel never actually argued to the jury that

the co-defendant had been the shooter. Instead, the record shows that, during the state's initial closing argument, after the state quoted the "Principals" instruction to the jury, the state's only sentence attempting to apply that instruction to the evidence was "So, here, it's that **[*the co-defendant*] did something, told [*the defendant*] something that made [*the defendant*] do this.**" (emphases added).

Thus, the state did not attempt to show that the *co-defendant* was the shooter, with the defendant being the principal who "had a conscious intent that the criminal act be done" and "did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise [the co-defendant] to actually commit or attempt to commit the crime." Rather, the state attempted to show that *the defendant* was the shooter, with the co-defendant being the principal who "had a conscious intent that the criminal act be done" and "did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise [the defendant] to actually commit or attempt to commit the crime."

We can only surmise that the state's trial counsel, in proposing the "Principals" instruction, simply may have misunderstood the instruction's lack of application to the direct evidence of guilt which the state presented in this case, as summarized above.

### *Conclusion*

In sum, although we agree with the defendant's argument that the state presented insufficient evidence to support the trial court's reading of the "Principals" instruction to the jury, we conclude the defendant's trial counsel did not timely object to the "Principals" instruction, and therefore did not preserve that objection for appeal. We further conclude that the trial court's reading of the "Principals" instruction to the jury did not rise to the level of fundamental error, because the state could have obtained the guilty verdicts against the defendant without the alleged error's assistance. Thus, we affirm the defendant's convictions and sentences. On the five remaining arguments which the defendant has raised in this appeal, we affirm without further discussion.

KLINGENSMITH, C.J., and WARNER, J., concur.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***